**BEAN STUYVESANT, L.L.C., Plaintiff,**

v.

**The UNITED STATES, Defendant,**

**NATCO Limited Partnership,
Intervenor–Defendant.**

No. 00–604C.

United States Court of Federal Claims.

Dec. 1, 2000 [1].

1. This opinion was issued under seal on November 15, 2000. Pursuant to ¶ 3 of the ordering language, the parties identified proprietary material subject to deletion on the basis that the material was protected/privileged. Brackets identify the material deleted.

Peter M. Kilcullen, Washington, D.C., attorney for plaintiff. Ronald E. Gilbertson, Washington, D.C., of counsel.

Christian J. Moran, Washington, D.C., with whom were David M. Ogden, Assistant Attorney General, David M. Cohen, Director, Deborah A. Bynum, Assistant Director, for defendant. John Turner, Army Corps of Engineers, Jacksonville, Florida, of counsel.

Daniel C. Sauls, Washington, D.C., attorney for intervenor-defendant.

## OPINION

BUSH, Judge.

This is a post-award bid protest in which plaintiff, Bean Stuyvesant L.L.C. ("Bean"), seeks to enjoin the United States Army Corps of Engineers (the "Corps") from rejecting its proposal for a beach renourishment and shore protection project in Sunny Isles and Miami Beach, Florida. Bean protests the Corps' award of the contract to the intervenor, NATCO Limited Partnership ("NATCO"), because the Corps failed to: (1) consider Bean's lower price in making a competitive range determination; (2) hold discussions with Bean prior to arriving at an award determination; and (3) properly evaluate Bean's proposal under the Request for Proposal ("RFP").

This matter is currently before the court on plaintiff's motion for a permanent injunction and declaratory judgment; on defendant's and intervenor's oppositions thereto; and on the parties' cross-motions for summary judgment on the administrative record.

## I. BACKGROUND

### A. Facts

On or about July 6, 2000, the Jacksonville, Florida District Office of the Corps issued Solicitation No. DACW17–00–R–0025, entitled "Modifications to Sunny Isles Segment and Beach Renourishment at Miami Beach, Shore Protection Project, Dade County, Florida." The solicitation required the contractor to dredge the sand from an offshore borrow area and to place it on the beach at Sunny Isles, Florida to create a widened beach berm. It also required the contractor to construct an offshore breakwater to protect the beach. In addition, the solicitation contained an option item for the placement of beach fill at the 63rd Street area of Miami Beach. The Independent Government Estimate ("Government Estimate") of performing both the base contract and the option item was $15,496,000.

The Corps determined that, for this procurement, it would use competitive negotiation procedures that evaluate factors other than price, rather than sealed bidding procedures where price is the only factor, because it was essential to evaluate the offeror's technical qualifications given the environmental sensitivity and restrictions surrounding this project. Both the advertisement for this project in the Commerce Business Daily and the Description of Work of the solicitation stated that "[p]rotection of the environment, especially the existing reef system, is of paramount importance." AR 20, 487a.[2]

#### 1. Work to be Performed

The solicitation included a detailed description of work to be performed under the terms of the contract. These provisions, which were incorporated as part of the contract upon award, are replete with instructions and requirements concerning hardbottom/reef protection.

Section 01410, captioned "Environment Protection", covers prevention of environ-

mental pollution and damage due to construction operations and the measures listed in other Technical Requirements. AR 352. Paragraph 3.1.4.11, titled "Hardground/Reef Protection[3]", states that existing hardground/reef areas would be designated and that the contractor "shall install all protection for these resources" to preserve them "as they existed at the time they were pointed out to the Contractor." AR 369. The paragraph also instructs that pipelines should be placed only in approved areas and any leaks, particularly over the hardground/reefs should be repaired immediately. Other paragraphs of this section also refer to the protection of other environmental resources, such as manatees and sea turtles. AR 356, 367 (Paragraphs 3.1 and 3.1.4.8, named "Protection of Environmental Resources" and "Sea Turtle Monitoring", respectively).

Section 02391, designated "Beach Fill", governs, among other things, how equipment is used while performing the operations connected with the excavation, transportation and placement of beach fill on the beaches. The Corps dedicates over three pages of this section to the protection of the hardbottom/reef communities and sets forth several requirements the contractor must fulfill to that end. AR 468–471; 451–471. At the forefront, it requires the contractor, within seven days after the Notice of Award and prior to equipment mobilization, to submit a Nearshore Hardbottom Protection Plan. AR 452. The contractor must also submit a precondition survey report of the hardbottom/reef communities and the Operational Box (the vicinity of the proposed pumpout location field) after receiving the Notice to Proceed. AR 453. The section also requires the contractor to monitor the hardbottom/reef communities at the pumpout operation area on a weekly basis, provide weekly reports on the condition of these resources in the vicinity of the Operational Box and, after

---

**2.** "AR ___" refers to the numbered pages of the administrative record.

**3.** The Corps uses "hardbottom," "bottom", "hardground" and "reef" interchangeably throughout the solicitation. "These terms refer

to area of exposed rock or rock covered by a thin veneer of sand that supports communities of soft and hard coral species, sponges, algae and various benthic invertebrate and fish species." Def.'s Statement of Facts 3, n. 2.

removal of the equipment from the Operational Box, to submit a post-condition survey report of hardbottom/reef communities. AR 453–54; 469–70.

Section 02391 imposes specific requirements on the contractor to protect the hardbottom/reef resources in the borrow area, and the Operational Boxes outside and inside of the pipeline access corridor. AR 464–65, 468–71. This section requires the contractor to use a hopper dredge[4] to excavate beach fill from the designated borrow areas. AR 464. The contractor must sail the loaded hopper dredge from the borrow area to the Operational Boxes and hook up to a pipeline (or a booster pump and pipeline) to pump sand to the beach. AR 468. With regard to the borrow area, the contractor may not encroach on the hardgrounds by anchors, cables, or dragheads because "marine hardgrounds occur parallel to both the east and west sides of the borrow areas." AR 464. Contract Drawings 4/1 and 4/2, provided with the solicitation, identify the Corps' information regarding the location of the reefs and hardbottoms near the borrow areas and state that "[t]he borrow areas have been located to have a 400-foot buffer zone from the hardbottom/reef communities." Despite the Corps' identification of the hardbottom/reef areas, the contractor must use divers, prior to dredging, to "determine the exact locations and condition of the marine hardgrounds adjacent to the borrow area." AR 464. Paragraph 3.2.1 also limits the contractor's dredging methods in the borrow area "[t]o minimize the concentration of sedimentation on the adjacent hardground/reef areas." AR 464. In addition, the solicitation states that the Dade County Department of Environmental Resources Management ("DERM") would monitor the hardbottom/reef resources in the vicinity of the borrow area to determine whether the contractor's dredging activities created sedimentation and stress. AR 465.

Contract Drawings ¼ and 1½ also indicate the known hardbottom/reef communities located in close proximity to the Operational Boxes the contractor uses for pumpout operation. Paragraph 3.3.1 of Section 02391 states that although the boundaries of the Operational Boxes were designed to be at least 150 feet away from known hardbottom/reef resources, the contractor must verify the existence of these resources in the Operational Boxes prior to placement of equipment, such as anchors, pilings, spuds, etc., to ensure that the hardground resources would not be impacted. AR 468–69.

Paragraph 3.3.2 and subsequent subparagraphs govern "Protection of Hardbottom Areas Within the Identified Pipeline Corridors". AR 470–471. Contract Drawings ¼ and 1½ identify the locations of the pipeline corridors and the hardbottom/reefs they cross. Paragraph 3.3.2.1 prohibits the contractor from using floating pipeline, within the pipeline corridor, to traverse the hardbottom/reef communities and requires that the contractor place submerged pipeline in a manner that minimizes, to the greatest extent possible, impact to the hardbottom. AR 470. Paragraph 3.3.2.4 dictates the contractor's placement of the pipeline to ensure minimal contact to the hardbottom/reef habitat. *Id.* Paragraph 3.3.3 requires diver inspections of the pipeline and its connections to prevent leaks that could damage the surrounding environment. AR 471.

In addition, Section 02278, entitled "Stone Protection" in connection with breakwater construction, also addresses protection of hardbottom/reef resources. Paragraph 3.4.3 requires the contractor to have certified divers to assist in the placement of anchors, spuds, or temporary piling to ensure that the anchoring methods do not occur near the hardbottom/reef areas. AR 432.

### 2. Requirements of Submitted Proposals—Section 00100

The solicitation requested submission of

---

4. "A hopper dredge is a self-contained or self-propelled vessel that excavates material from the sea floor through dragarms that trail from the vessel. The excavated material is loaded into an empty space (a hopper) in the vessel. The hopper dredge then can sail to a designated unload-ing or disposal location with its load of material. Unloading may be accomplished by pumping the excavated material through a pipeline to a beach or upland disposal area." Def.'s Statement of Facts 4, n. 3.

proposals by August 31, 2000.[5] Section 00100, designated "Instructions to Bidders", provided offerors with Source Selection Information. AR 37–55. Paragraph 1.1 of Section 00100, in pertinent part, states:

> The Government intends to make award without discussions and without giving offerors an opportunity to revise their offers; therefore, offerors are encouraged to include their best terms and conditions (both price and technical) in their initial offer. The Government reserves the right to conduct discussions if the Contracting Officer later determines them to be necessary. By submitting an offer in response to this solicitation, offerors are agreeing to comply with all terms and conditions contained in the solicitation. AR 37.

Paragraph 2 stated that each offeror's proposal would include an oral presentation. It also required that the written proposal would consist of two packages. The first package had to include the offeror's contractual documentation, including price schedule, subcontracting plan, and past performance materials. The second package was to contain the offeror's written documentation to be used at the oral presentation. *Id.* Paragraph 5.1 of Section 00100 stated the basis for award based upon the oral presentation and written materials. AR 41. It states, in relevant part:

> *Award Basis.* Award will be made to the offeror whose proposal represents the best value to the Government. Best value will be determined by a trade-off process that combines non-price and price factors. The Government reserves the right to award to other than the offeror with the highest technical rating and reserves the right to award to other than the offeror with the lowest price. Non-price factors are slightly more important than price. Non-price

factors will be evaluated on a point system. Award will be made on a 1000–point scale.... [6]

*Id.*

Paragraph 3 of Section 00100 sets forth the requirements for the oral presentations. It states, in relevant part, the following:

> 3. *ORAL PRESENTATIONS.* In addition to the written proposal, each offeror shall make an oral presentation at a time to be specified at a later date. The purpose of the oral presentation is to give the offeror an opportunity to make the Government's evaluators aware of the offeror's qualifications.... The oral presentation shall follow this outline:
>
> \* \* \* \* \* \*
>
> 3.3. *Technical Approach.*
> 3.3.1. *Ability to Complete all Work in Compliance with the Environmental Criteria.* The offeror shall describe the proposed technical approach for executing the work in accordance with the Plans and Specifications. The proposal shall include a description of how the plant and equipment to be used will not impact the adjacent environmental resources throughout the entire project area. Potential impacts could include turbidity, sedimentation, and mechanical damages. If anchors are to be used, it must be proven that impacts to adjacent environmental resources will not occur. Chaffing of pipelines cannot be allowed if there is a possibility of damage to adjacent environmental resources. The offerors [sic] proposal must be in compliance with the Plans and Specifications. The objective should be to instill confidence that the offeror thoroughly understands the requirements and complexities of this project, and that the offeror has developed a well thought out plan that integrates all related activities. All examples describing

---

5. The original proposal due date was August 15, 2000. It was later extended to August 25, 2000 and then finally, to August 31, 2000. AR 10, 12–13.

6. The Corps categorized the non-price factors and their corresponding point allocations in the following manner:
 *Non–Price Factors—1000 points:*
 A. *Written Presentation*—175 points
 B. *Oral Presentation*—825 points

> 1. Management Plan—200 points
> 2. Technical Approach—500 points
> a. Borrow area—125 points
> b. Pump out area—125 points
> c. Pipeline area—125 points
> d. Breakwater area—125 points
> 3. Past Performance Presentation—125 points

AR 41.

similar type experience must come from the projects to be addressed later in the presentation under past performance.

3.3.1.1. *Describe Method for Extraction of Material from Borrow Area Without Damaging the Environmental Resources.* It is not unusual for waves that are three feet high and above to occur in the project area; therefore, a detailed description of how plant and equipment to be used and the method of accomplishing the work in rough weather is needed.

3.3.1.2. *Describe Method for Transferring Material from Dredge to Placement Area Without Risking Damage to Environmental Resources due to Equipment Utilized Outside the Pipeline Access Corridor.* It is not unusual for waves that are 3 feet high and above to occur in the project area, therefore a detailed description of how plant and equipment to be used and the method of accomplishing the work in rough weather is needed. Include details on mobilization, installation, operation and demobilization. Indicate the sea condition that will necessitate the removal of the equipment and the contingency plan for this.

3.3.1.3. *Describe Method for Transferring Material from Dredge to Placement Area Without Risking Damage to Environmental Resources due to Equipment Utilized Inside the Pipeline Access Corridor.* It is not unusual for waves that are 3 feet high and above to occur in the project area, therefore a detailed description of how plant and equipment to be used and the method of accomplishing the work in rough weather is needed. Include details for installing and removal of the pipeline, buoys and dredging equipment.

3.3.1.4. *Describe Method of Placement and Quality Control for Construction of Breakwater in Open Shallow Water and Rough Wave Environment in Area Surrounded in Close Proximity to Important Environmental Resources.* It is not unusual for waves that are 3 feet high and above to occur in the project area, therefore a detailed description of how plant and equipment to be used and the method of accomplishing the work in rough weath-

er is needed. Include details for mobilizing, mooring and anchoring equipment and methodology to construct the breakwater.

3.4. *Past Performance.* From the list of contracts provided with the written proposal, select the 3 most recent and similar contracts and present a synopsis of each. The synopsis must cover the sub factors listed below. It is preferred that the 3 contracts selected represent all sub factors, but, if more contracts are required to show similar experience, up to 2 additional contracts per factor may be chosen. Similar projects are defined as projects that involved open ocean dredging of sand around environmental resources that were required to be protected and constructing breakwaters in shallow water in a rough wave environment. In selecting similar past performance, the offeror may include its performance, the performance of predecessor firms, the performance of subcontractors, and the performance of key employees of the offeror and proposed subcontractors.

3.4.1. *Description of Project.* Describe the project and explain how it is similar to this project. Similarity need not be established for all the sub factors; however, the less similarity the offeror is able to establish, the less points will be allowed by the Government's evaluators.

3.4.1.1. *Compliance with Environmental Criteria.* Describe the environmental resources that were required to be protected and any problems encountered and how those problems were solved.

Paragraph 4 of Section 00100 sets forth the rules for making presentations. It provides, in relevant part:

4. *RULES FOR THE ORAL PRESENTATION.*

4.3. *Limitations on Government-offeror interaction during and after the presentation.* The Government's representatives will not interrupt the presentation (except to ask for a repeat of a passage that may not have been heard the first time). During the Q & A sessions, the Government's representatives will ask questions to obtain clarification of any information presented by the offeror. Price will not be discussed

at any time during the oral presentation process. The Government will not provide feedback regarding the quality of the offeror's presentation. (In accordance with FAR subpart 15.5, offerors may request a debriefing at the appropriate time.)

4.5. *Time.* The presentation will proceed as follows:

\*　　\*　　\*　　\*　　\*　　\*

The offeror will be allowed 2 hours for the presentation of the Management Plan, Technical Approach and Past Performance. The 2 hours may be used at the offeror's discretion between the 2 presentations. The 30 minute wrap-up session will not be included in the 2 hours. At the conclusion of each presentation, the offeror's representatives will be asked to leave the room and the Government's evaluators will meet for no more than 15 minutes to discuss the presentation and develop any questions the Government may wish to ask. At the conclusion of the Government's meetings, the offeror's representatives will be asked to return to the room to answer questions. The Q & A sessions will last for no more than 30 minutes.

4.6. *Presenters* . . . . . The management plan and past performance portions of the presentation must be presented by the offeror's project manager. For major items of subcontracted work (e.g., the breakwater) and for subcontractor past performance, the offeror may use the subcontractor's project manager as the presenter . . . .

4.7. *Government participants.* The Government will be represented by approximately 10 persons (including the contracting officer . . . )

Paragraph 5 of Section 00100 sets forth the "Proposal Evaluation Procedures." AR 41.

5. *PROPOSAL EVALUATION PROCEDURES*

5.1. *Award Basis.* [paragraph recited, *supra*]

5.2. *Evaluation Process.* The evaluation process will proceed as follows:

5.2.1. *Written Evaluation Process.* The Government will review the offeror's written proposal as to adherence of the requirements of the plans and specifications. Evaluation of the subcontracting plan and past performance will be based on a 175–point scale.

Government Estimate Comparison. If any offered price, exceeds the IGE by more than 25%, send the abstract (with names of offerors removed) to the Cost Estimating Branch and request verification of the IGE.

After the accuracy of the IGE is verified (and, if necessary, the IGE is revised), eliminate from further consideration any offer (including the award fee) that exceeds the IGE by more than 25%. (In accordance with EFARS 36.205, the Government cannot award a contract at a price that exceeds the IGE by more than 25%.) (Note: This step presumes there will be no negotiations as defined at FAR 15.306(d). Should the Contracting Officer determine that negotiations are necessary, offerors who have been eliminated by this step may be included in the competitive range and receive further consideration.)

\*　　\*　　\*　　\*　　\*　　\*

Past Performance. Using the list provided by the offeror and information gathered from other sources, the Government will select 3 projects for past performance review. The Government will contact project owners and ask questions regarding: (i) compliance with environmental criteria, (ii) quality control, (iii) compliance with safety standards, (iv) responsiveness to customer's needs, (v) timeliness, (vi) subcontracting goals and subcontractor coordination/control, and (vii) cost control of change order work. The evaluation will be based on a 125–point scale. The Government may select for past performance review all, some, or none of the same 3 projects the offeror presents in its oral presentation . . . .

5.2.2. Oral Evaluation Process. The Government will evaluate the offeror's oral presentation for clarity, completeness, thoroughness and reasonableness. The evaluation will be based on a 825–point

scale with points assigned to each sub factor as follows:

5.2.2.1. Management Plan. 200 points further broken down as follows:

B. Performance Schedule—50 points

C. Safety Program and Plan—50 points

D. Quality Control Organization and Plan—50 points

E. Organizational Chart and Plan for Performing the Work—25 points

F. Cost Controls for Change Order Work—25 points

5.2.2.2. Technical Approach. Ability to Complete all Work in Compliance with the Environmental Criteria—500 points further broken down as follows:

• Method for Extraction of Material from Borrow Area Without Damaging Environmental Resources—85 points

• Detailed Description of Method of Accomplishing the Above in Seas 3 Feet High and Above—40 Points [7]

• Method for Transferring Material from Dredge to Placement Area Without Risking Damage to Environmental Resources due to Equipment Utilized Outside the Pipeline Access Corridor—85 points

• Method of Transferring material from dredge to placement area without risking additional environmental impacts due to equipment utilized inside the pipeline access corridor—85 points

• Method of Placement and Quality Control for Construction of Breakwater in Open Shallow Water and Rough Wave Environment in Area Surrounded by Close Proximity to Important Environmental Resources—85 points

5.2.2.3. *Past performance* . . .—125 points further broken down as follows:

• Compliance with Environmental Criteria—25 points

\* \* \* \* \* \*

The Source Selection/Evaluation Plan repeats the language from Paragraphs 3, 4, and 5 of Section 00100. AR 1656–1662. It also describes the criteria the evaluators must use to judge the proposals and provides a separate description for each subfactor. AR 1667–1686.

In addition, the solicitation incorporates FAR 52.217-5, titled "Evaluation of Proposals". This provision states:

(a) Except when it is determined in accordance with FAR 17.206(b) not to be in the Government's best interests, the Government will evaluate offers for award purposes by adding the total price for all options to the total price for the basic requirement. Evaluation of options will not obligate the Government to exercise the option(s).

AR 49.

### 3. Submitted Proposals

On August 31, 2000, NATCO and Bean submitted their proposals. AR 1637, 1649. NATCO's price for the total contract was [ ]. *Id.*; AR 1639. This amount was approximately [ ]% above the Government Estimate for the base contract plus the option. See AR 490. Bean's proposed price for the entire contract was [ ]. AR 947; 1637; 1649. This amount was below the Government Estimate. Bean and NATCO made their oral presentations on September 6 and 7, 2000, respectively. *Id.* The Corps videotaped each oral presentation.

#### a. Bean's Oral Presentation and Evaluation

Bean's oral presentation followed the format set forth in Paragraph 4.5 of Section 00100. See AR 41. However, Ancil Taylor, the Vice President—General Manager for Bean, rather than Bean's proposed project manager for this project, made the main oral presentation on behalf of Bean. The evaluation team deducted twenty (20) points from Bean's Management Plan score because of Bean's failure to comply with the solicitation's requirement that the project manager present the management plan and past performance portion of the presentation.

After answering the evaluator's questions regarding its Management Plan, Bean presented its Technical Approach to the project.

---

**7.** This criteria is a subfactor of each of these listed subfactors and is consistently worth 40 points. For brevity, it will not be repeated under each subfactor.

Bean Videotape 0:56:33 to 1:28:30. Of the seven slides Bean submitted for its Technical Approach, two had narrative text mentioning hardbottom/reef protection. AR 1022–1029; 1026; 1028.[ ], the representative for Bean's subcontractor, [ ], discussed hardbottom/reef monitoring during this portion of the presentation. AR 1007–1009; See Bean Videotape 0:56:33 to 1:28:30. Mr. [ ] spent approximately ten minutes discussing in detail the written plan submitted by Bean for hardbottom/reef monitoring, which addressed several paragraphs of the solicitation relating to hardground/reef monitoring. Bean Videotape *id.;* AR 1013–1020.

Mr. Taylor followed Mr. [ ]'s brief presentation and discussed extracting and transferring the sand. At the beginning of his portion of this presentation, Mr. Taylor stated that he recognized that reef habitat is important to South Florida and that Bean would document information to get this project accomplished with environmental concerns in mind. He then addressed each technical specification in the solicitation. Mr. Taylor did not specifically explain how Bean would protect the hardbottom.[8] Instead, Mr. Taylor discussed how Bean would use the equipment to extract and transfer sand, the use of turtle excluder devices, and environmentally safe dye. Mr. Taylor also generally referred to the "sensitive area", stating that Bean would not mobilize/demobilize equipment in the sensitive area and would not allow equipment, such as wires or cables, to drag into the sensitive area. Bean Videotape 0:56:33 to 1:28:30.

[ ] from [ ], Bean's subcontractor for construction of the breakwater, made a brief, approximately three minute, presentation regarding the breakwater construction. Bean Videotape 1:21:13 to 1:24:30. Mr. [ ] did not discuss whether [ ] was capable of performing in seas above three feet; however, he addressed this issue when questioned by the evaluators. *Id.* Bean's Technical Approach portion of the oral presentation was approximately 32 minutes. Bean Videotape 0:56:33 to 1:28:30.

Following Bean's Technical Approach presentation, Bean discussed its past performance. Bean Videotape 1:28:31 to 1:52:45. Mr. Taylor addressed three projects that Bean believed were similar to the current project. Of the three projects, the Canaveral Project had required exact placement of pipeline along the sea bottom to the placement area and the Boca Raton Project, which Mr. [ ] addressed, required avoidance of a series of reefs and for the equipment to work harmoniously with the sensitive area. *Id.*

After Bean's presentations of its Technical Approach and Past Performance, the Corps evaluation team asked Bean ten questions regarding both presentations. Bean Videotape 1:53:07 to 2:11:06; AR 1507–09. None of the questions specifically concerned environmental protection of the hardbottom or coral reefs. *Id.* However, one question asked Bean to "Clarify the performance of dredging in waffle pattern in the borrow area to minimize turbidity and sedimentation impacts to surrounding reefs." AR 1507. In response, Mr. Taylor focused on protection of sea turtles and how the dragheads, trenches and program lines would operate. Bean Videotape 1:53:07 to 2:11:06.

Following Bean's entire oral presentation, the evaluators scored Bean's proposal. Each individual evaluator arrived at his or her own score for Bean in each of the specified areas and all of the evaluation team members met and reached a consensus score for Bean. Bean's Management Plan received a score of 140 out of a possible 200 points. In that arena, Bean only objects to the evaluators' twenty point deduction for Bean's failure to have the project manager present its oral presentation, in accordance with Paragraph 4.6 of Section 00100.

Bean's Technical Approach received the following scores:

8. Contract Drawing 4/1 does not indicate that there is hardbottom in the specific excavation areas.

| Evaluator's Name | [ ] | [ ] | [ ] | [ ] | [ ] | [ ] | Consensus |
|---|---|---|---|---|---|---|---|
| Technical Approach—500 points | | | | | | | |
| Extraction of Material from Borrow Area—85 pts | 75 | 75 | 65 | 65 | 75 | 55 | 65 |
| Accomplishing in Seas 3 ft and Above—40 pts | 40 | 31 | 40 | 35 | 40 | 40 | 40 |
| Transferring Material Dredge to Area—Outside—85 pts | 40 | 30 | 40 | 40 | 30 | 30 | 35 |
| Accomplishing in Seas 3 ft and Above—40 pts | 40 | 35 | 40 | 35 | 40 | 40 | 40 |
| Transferring Material Dredge to Area—Inside—85 pts | 70 | 20 | 30 | 30 | 65 | 40 | 20 |
| Accomplishing in Seas 3 ft and Above—40 pts | 30 | 35 | 30 | 30 | 40 | 30 | 35 |
| Breakwater Construction—85 pts | 60 | 65 | 20 | 30 | 65 | 20 | 20 |
| Accomplishing in Seas 3 ft and Above—40 pts | 30 | 30 | 20 | 25 | 30 | 20 | 25 |
| Total—Technical Approach—500 pts | 385 | 321 | 285 | 290 | 385 | 275 | 280 |

AR 1346.

The Corps summarized its findings of Bean's oral technical presentation in an undated document entitled "Best Value Technical Assessment", Appendix D of the Source Selection Determination. AR 1708–1712. With regard to Bean's Technical Approach score, that document states the following:

> Bean Stuyvesant, L.L.C. received 280 points out of a maximum of 500 points for this factor. Due to the environmental concerns and complexity of the work, Bean Stuyvesant's oral presentation demonstrated a lack of understanding the purpose of the oral presentation. They did not assure the Corps that they understood the environmental risks and showed little detail of how they would handle them. Bean Stuyvesant spoke more about sea turtles protection, which is a relatively minor concern in the project area, and hardly mentioned hardbottom protection, which is a major concern. Bean Stuyvesant's Technical Plan only received an outstanding rating for being able to work in 4 to 5 foot seas at the borrow site and inside and outside the pipeline corridor.

AR 1709.

The Best Value Technical Assessment document also states that Bean received 115 points out of a possible 125 for its Past Performance discussion during its oral presentation and 114 out of a possible 125 points for its Past Performance record as determined by contacting Bean's disclosed references. AR 1709. Bean does not challenge its own oral Past Performance rating. However, Bean does object to the Corps' failure to divulge [ ], the breakwater construction subcontractor, poor past performance record. [ ] received a total of [ ] points out of a possible thirteen for its Past Performance evaluation. AR 1347. The Corps determined that the subcontractor lost points on nearly every evaluation factor, including Compliance with Environmental Criteria, Quality Control, Safety, Responsiveness, and Timeliness. AR 1624–1626; 1710. Bean earned 36 of 50 points for its subcontracting plan. AR 1710.

Bean's non-price score totaled 685 points out of a possible 1000. AR 1346–47. According to the source selection plan, a score of 685 points means that the "[p]roposal demonstrates shallow understanding of requirements and approach that only marginally meets performance or capability standards necessary for minimal but acceptable contract performance." [9] AR 1666.

9. The overall numeric rating system for non-price factors of the proposal is as follows:

| NUMERICAL | DEFINITION |
|---|---|
| 900–1000 | Proposal demonstrates excellent understanding of requirements and approach that significantly exceeds performance or capability standards. Has exceptional strengths that will significantly benefit the Government. |
| 800–899 | Proposal demonstrates good understanding of requirements and approach that exceeds performance or capability standards. Has one or more strengths that will benefit the Government. |
| 700–799 | Proposal demonstrates acceptable understanding of requirements and approach that meets performance or capability stan- |

b. **NATCO's Oral Presentation and Evaluation**

NATCO's presentation, like Bean's, followed the format set forth in Paragraph 4.5 of Section 00100. AR 41. During NATCO's presentation of its Management Plan, NATCO repeatedly discussed its concern for protecting the hardbottom/reef areas, including the topic in its [ ] portions of the presentation. NATCO Videotape 0:26:29 to 0:28:40; 0:43:02 to 0:45:50.

NATCO submitted [ ] slides relating to its Technical Approach. AR 641–725. At least [ ] of these slides discuss hardbottom/reef communities or chaffing of the ocean floor. AR [ ]. Throughout its presentation, NATCO addressed protection of the hardbottom/reef communities and other environmental concerns. NATCO Videotape 0:57:18 to 2:01:40. Specifically, NATCO stated that its focus was hardground protection, minimizing turbidity and sedimentation that can impact hardground area, and endangered species such as sea turtles, manatees, and whales. NATCO referred to protection of the hardground area more thoroughly in its discussions of its [ ]. *Id.* [ ], NATCO's breakwater construction subcontractor, made an approximately 24 minute presentation on the construction of the breakwater. NATCO Videotape 1:37:20 to 2:01:40. Mr. [ ], among other things, stated that his company wanted to ensure that the hardbottom areas were not impacted by the project and that it could work in seas greater than three feet. NATCO Videotape 1:58:20 to 2:01:40. NATCO's Technical Approach presentation lasted approximately 63 minutes.

The evaluation team gave NATCO the following scores for its Technical Approach:

| Evaluator's Name | [] | [] | [] | [] | [] | [] | Consensus |
|---|---|---|---|---|---|---|---|
| Technical Approach—500 points | | | | | | | |
| Extraction of Material from Borrow Area—85 pts | 85 | 85 | 85 | 85 | 80 | 85 | 85 |
| Accomplishing in Seas 3 ft and Above—40 pts | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Transferring Material Dredge to Area—Outside—85 pts | 80 | 85 | 85 | 85 | 70 | 80 | 80 |
| Accomplishing in Seas 3 ft and Above—40 pts | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Transferring Material Dredge to Area—Inside—85 pts | 85 | 85 | 85 | 85 | 40 | 20 | 80 |
| Accomplishing in Seas 3 ft and Above—40 pts | 40 | 40 | 40 | 40 | 40 | 40 | 40 |
| Breakwater Construction—85 pts | 75 | 75 | 70 | 75 | 75 | 75 | 75 |
| Accomplishing in Seas 3 ft and Above—40 pts | 30 | 30 | 30 | 40 | 30 | 25 | 30 |
| Total—Technical Approach—500 pts | 475 | 480 | 475 | 490 | 415 | 405 | 470 |

AR 1055.

The Best Value Technical Assessment stated, with regard to NATCO's Technical Approach, that:

NATCO was rated outstanding in every factor but one on their Technical Presentation. NATCO's oral presentation demonstrated a full understanding of the purpose of the presentation. NATCO's presentation assured the Corps they understood the environmental risks and thoroughly discussed, in great detail, how they would handle the risks. The only factor NATCO received a satisfactory rating was Construction of Breakwater. NATCO's subcontractor is only able to work in 3–foot seas not 4 to 5 foot seas and they did not present their Severe Weather Contingency Plan. NATCO also lost points inside and

| | |
|---|---|
| | dards. Acceptable solution. Few or no strengths. |
| 600–699 | Proposal demonstrates shallow understanding of requirements and approach that only marginally meets performance or capability standards necessary for |

| | |
|---|---|
| | minimal but acceptable contract performance. |
| 600 | Fails to meet performance or capability standards. Requirements can only be met with major changes to the proposal. |

outside the pipeline access corridor for not discussing:

1. Visual inspections of pipeline when divers could not dive due to weather.

2. The disposal of rock at the rock disposal area.

3. Assuring that cables and buoys do not chaff any environmental resources inside and outside the pipeline corridor.

AR 1711. As with Bean, NATCO's evaluation report is based on the findings of the individual evaluators. See e.g., AR 1115–16, 1120–21, 1206–07, and 1211. The evaluators' comments included three comments noting NATCO's weakness in discussing potential hardground impacts as a result of cable drags by buoys attached to pipe, propwash and boat draft. AR 1165–66; 1170; 1253–54.

Following NATCO's Technical Approach presentation, NATCO discussed its Past Performance. NATCO Videotape 2:01:40 to 2:21:10. NATCO addressed why it encountered problems with the hardbottom areas on a previous job at the subject location and its solution to the problems. NATCO Videotape 2:13:48; AR 784. The Corps had given NATCO an award for Contractor of the Year in the South Atlantic Division in 1997. NATCO Videotape 0:07:55; AR 544. The company had also won an award for its approach to a sensitive environmental problem in Boston Harbor. AR 545; NATCO Videotape 0:08:10. In an evaluation summary of NATCO's past performance based upon the three projects provided by NATCO, the Corps gave NATCO an overall outstanding rating. It noted that on a project at the same location as the subject project, although NATCO had some problems complying with the environmental criteria, due, in part, to differing site conditions, it created a solution for the problems and worked well with the agencies involved to mitigate any impact to environmental resources. AR 1343. On this same project, NATCO's subcontractor, [ ], received a satisfactory evaluation for its construction of an artificial reef. Id. The evaluation team deducted five points from NATCO's oral Past Performance score because of its failure to comply with environmental criteria involving "surfside cable drag." AR 1091.

NATCO's score totaled 939 points out of a possible 1000. AR 1055–56. According to the source selection plan, a score of 939 points means that the "[p]roposal demonstrates excellent understanding of requirements and approach that significantly exceeds performance or capability standards. Has exceptional strengths that will benefit the Government." AR 1666.

### 4. Agency Responses to Proposals

On September 21, 2000, Claudia Hundley, the contracting officer ("CO"), made a competitive range decision. AR 1637. The first paragraph of the memorandum for the Determination of the Competitive Range, states the proposed prices for each of the offerors' proposals. Id. The memorandum also states:

3. Appendix B of the approved Source Selection Plan provides a numerial [sic] definition for an overall point rating. Utilizing this rating system, Bean Stuyvesant L.L.C.'s evaluation points of 685 indicate the following: Proposal demonstrates a shallow understanding of requirements and approach that only marginally meets performance or capability standards necessary for minimal but acceptable contract performance. Bean Stuyvesant failed to adequately address the solicitation requirements and a significant revision of the proposal would be required. In which case, the government would be put in the position of leading the offeror to a solution or approach, which is unfair to the other offerors.

4. It is my determination, that, based on the above, a total score [sic] 685 points eliminates Bean Stuyvesant from the competitive range, leaving NATCO as the only offeror in the competitive range.

Id. This same day, Ms. Hundley, in a letter essentially reiterating the Determination of Competitive Range memorandum, notified Bean that it was excluded from the competitive range. AR 1714.

On September 21, 2000, Ms. Hundley also contacted NATCO, via letter, to inform NATCO that its proposal was within the competitive range. The letter also stated that, in accordance with Section 00100, Paragraph 1.1 of the solicitation, which contained a reserva-

tion of rights for the Government to open up discussions if it determined them to be necessary, she had determined that discussions were necessary and opened up discussions with NATCO. Ms. Hundley stated that as NATCO's proposed price was considered at "the high end of the scale", it was being afforded an opportunity to submit a revision of its price. AR 1640. NATCO responded with a revised price of $18,212,263.00. AR 1641–43. This amount was approximately 17.5% above the Government Estimate. The agency awarded the contract to NATCO on September 26, 2000. AR 1715–20.

The Source Selection Determination memorandum, dated September 26, 2000, in pertinent part, states:

9. COMPETITIVE RANGE DETERMINATION. Review of the technical points and proposed prices revealed Bean Stuyvesant with the lowest price and yet points that indicated a shallow understanding of the technical requirements per definitions provided .... Bean Stuyvesant did not adequately address the solicitation requirements and a significant revision of the proposal would be required, thereby, putting the Government in the position of leading the offeror to a solution or approach to the project if negotiations were entered into with the firm. On the other hand, NATCO Limited Partnership had points indicating an excellent understanding of the technical requirements and a price approximately [ ] above the Government Estimate. A decision was made by the Contracting Officer to open discussions. In accordance with FAR 15.306(c), a competitive range determination was made, eliminating Bean Stuyvesant from the competitive range based on their low technical score, leaving NATCO as the only offeror within the competitive range.

\* \* \* \* \* \*

10. AWARD.

\* \* \* \* \* \*

Bean Stuyvesant's oral presentation demonstrated a significant lack of understanding as to the purpose of the oral presentation. They did not assure the Corps that they understood the environmental [sic]

risks and showed little detail of how they would handle them. Bean Stuyvesant spoke more about sea turtle protection, which is a relatively minor concern in the project area and hardly mentioned hard-bottom protection, which is a major concern.

An important indicator which significantly demonstrated the firm's lack of understanding of the care that must be taken to ensure that no damage occur to the environmental resources was their selection of their subcontractor for construction of the breakwater. The subcontractor's past performance documented an unacceptable past performance record in areas of environmental compliance, quality control and responsiveness to customer's needs, which, in effect, would increase the risk of damage to the environmental resources if the contract were awarded to Bean Stuyvesant.

Even though the price submitted by Bean Stuyvesant was less than the Government Estimate, [ ] less than NATCO's original proposed price and [ ] less than NATCO's revised price, the lack of demonstrated technical experience in their proposal and their failure to indicate any understanding of the significance of protection of the environmental resources would make award to the firm unacceptable regardless of their price.

NATCO's technical score reflects a complete understanding of not only the technical requirements of the job, but also the overriding significance of protecting the environmental resources. Their presentation instilled the highest level of confidence in the Technical Evaluation Team as well as the Contracting Officer that they had a well thought-out plan to prevent damage to the environmental resources. It is therefore determined that an award will be made to NATCO Limited Partnership which represents the best value to the government.

AR 1648–52.

By letter dated September 25, 2000, Bean requested a post-award debriefing and on October 3, 2000, Bean was given a debriefing by the CO.

## B. Procedural History

On October 6, 2000, Bean filed the present case, seeking a temporary restraining order ("TRO"), preliminary and permanent injunctions enjoining the Corps from continuing performance under the subject contract, and declaratory relief nullifying the contract awarded to NATCO and compelling the Corps to place Bean in the competitive range. In its complaint, Bean asserts that the Corps' decision to award the contract to NATCO was arbitrary and capricious, lacking a rational basis, contrary to procurement law and regulation, and a breach of the Corps' implied contractual duty to fairly and honestly evaluate Bean's proposal because the Corps: (1) excluded Bean from the competitive range although its proposal was deemed to be "acceptable" and without considering Bean's lower proposal price; (2) failed to properly evaluate Bean's proposal by treating "hardbottom protection" as a significant factor when it was not listed as a significant factor or subfactor in the solicitation; (3) deducted points from Bean's Management Plan portion of its oral presentation when the solicitation did not provide a basis for such a deduction; (4) failed to give Bean an opportunity to respond to the Corps' concerns regarding Bean's coverage of "hardbottom protection" in its oral presentation; and (5) failed to give Bean an opportunity to respond to the Corps' findings of adverse past performance information regarding Bean's breakwater subcontractor, [ ].

By order dated October 17, 2000, pursuant to a telephone conference with the parties, a TRO was not issued in this matter pursuant to the Government's agreement that it would suspend performance under the contract until November 15, 2000. Cross-motions for summary judgment on the administrative record have been filed and are currently pending. Oral argument was held on November 3, 2000.

The court has jurisdiction over this matter pursuant to 28 U.S.C. § 1491(b)(1) and may grant Bean appropriate relief, "including declaratory and injunctive relief," if this court finds in its favor. *Id.* § 1491(b)(2).

## II. DISCUSSION

### A. Standards of Review

#### 1. Cross-motions for Summary Judgment

In deciding cross-motions for summary judgment upon the administrative record pursuant to Rule 56.1 of the Rules of the Court of Federal Claims ("RCFC"), this court treats the motions the same as a motion for summary judgment under RCFC 56. *Chas H. Tompkins Co. v. United States,* 43 Fed.Cl. 716, 719 (1999) (citing *Nickerson v. United States,* 35 Fed.Cl. 581, 588 (1996), *aff'd,* 113 F.3d 1255 (Fed.Cir.1997)). Summary judgment is properly granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. RCFC 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–248, 106 S.Ct. 2505, 2509–11, 91 L.Ed.2d 202 (1986); *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). The moving party bears the burden of establishing that there is no genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986) (citing *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 159, 90 S.Ct. 1598, 1609, 26 L.Ed.2d 142 (1970)). A fact is material if it may affect the outcome of the suit under the substantive law governing the action. *Anderson,* 477 U.S. at 248, 106 S.Ct. at 2510. All doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus,* 812 F.2d at 1390. However, the non-moving party has the burden of producing sufficient evidence that there is a genuine issue of material fact in dispute which would allow a reasonable finder of fact to rule in its favor. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Such evidence need not be admissible at trial; nevertheless, mere denials, conclusory statements or evidence that is merely colorable or not significantly probative is not sufficient to preclude summary judgment. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2548; *Anderson,* 477 U.S. at 249–50, 106 S.Ct. at 2505; and *Mingus,* 812 F.2d at 1390–91.

When the court is presented with cross-motions for summary judgment, each motion

must be evaluated on its own merits, under the summary judgment standards set forth above, and the court is not required to find summary judgment for either party simply because cross motions were filed. *Analytical & Research Tech., Inc. v. United States*, 39 Fed.Cl. 34, 43 (1997) (citations omitted). Nevertheless, this court has found that "[a] motion for summary judgment upon the administrative record, or for summary judgment, is an appropriate vehicle to scrutinize an agency's procurement actions because the issues are matters of contractual and regulatory interpretation." *Id.; Tompkins*, 43 Fed.Cl. at 719.

### 2. Review of Record in Bid Protest Cases

In a bid-protest matter, a court must not set aside an agency's procurement decision and grant injunctive or declaratory relief unless it is shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A) (1994); 28 U.S.C. § 1491(b)(4). In considering whether an agency's actions have been arbitrary or capricious, this court must consider, under the four factors set forth by the United States Court of Claims, whether: (1) "there was subjective bad faith on the part of the procurement officials;" (2) the procurement decision had a reasonable basis; (3) the procuring officials abused their discretion; and (4) the procuring officials violated pertinent statutes or regulations. *Cube Corp. v. United States*, 46 Fed.Cl. 368, 375 (2000) (citing *Keco Indus., Inc. v. United States*, 203 Ct.Cl. 566, 574, 492 F.2d 1200 (1974); *Southfork Sys., Inc. v. United States*, 141 F.3d 1124, 1132 (Fed.Cir.1998); *Cincom Sys., Inc. v. United States*, 37 Fed.Cl. 663, 676–77 (1997); *Aerolease Long Beach v. United States*, 31 Fed. Cl. 342, 355–56 (1994), *aff'd*, 39 F.3d 1198 (Fed.Cir.1994)); *Unified Architecture & Eng'g, Inc. v. United States*, 46 Fed.Cl. 56, 62 (2000) (citations omitted). However, "'there is no requirement or implication ... that each of the factors must be present in order to establish arbitrary and capricious action by the government.'" *Antarctic Support Assocs. v. United States*, 46 Fed.Cl. 145, 154 (quoting *Prineville Sawmill Co. v. United States*, 859 F.2d 905, 911 (Fed.Cir.1988)). This court has also stated that to determine that a protestor has prevailed under the arbitrary and capricious standard, the offeror must establish that (1) the procurement decision was not supported by a rational or reasonable basis, or (2) the procurement process showed a "clear and prejudicial violation of applicable statutes and regulations." *Synetics, Inc. v. United States*, 45 Fed.Cl. 1, 5 (1999) (citing *Logicon, Inc. v. United States*, 22 Cl.Ct. 776, 782 (1991); *Central Ark. Maintenance, Inc. v. United States*, 68 F.3d 1338, 1342 (Fed.Cir.1995)); *Ellsworth Assocs., Inc. v. United States*, 45 Fed.Cl. 388, 392 (1999) (citations omitted); *Day & Zimmermann Servs. v. United States*, 38 Fed.Cl. 591, 597 (1997) (citations omitted). "A protestor must prove the arbitrary and capricious nature of the Government's actions or the violation of an applicable procurement regulation by a preponderance of the evidence." *T & S Products, Inc. v. United States*, 48 Fed.Cl. 100, 104 (2000) (citing *CACI Field Servs., Inc. v. United States*, 854 F.2d 464, 466 (Fed.Cir.1988); *Ellsworth*, 45 Fed.Cl. at 392; *R.R. Donnelley & Sons, Co. v. United States*, 38 Fed.Cl. 518, 521–22 (1997); *PCI/RCI v. United States*, 36 Fed.Cl. 761, 767 (1996)).

In addition, the violation of a statute or regulation must be clear and prejudicial. *Beta Analytics Int'l, Inc. v. United States*, 44 Fed.Cl. 131, 136 (1999) (citing *Central Ark. Maintenance, Inc.*, 68 F.3d at 1342 (citation omitted)). However, to establish prejudicial error, although a protestor must demonstrate that the error in the procurement process was "significant", the protestor is not required to show that but for the agency's alleged error, it would have been awarded the contract. Instead, the protestor need only show that, had it not been for the alleged error in the procurement process, "'there was a substantial chance it would have received the contract award.'" *Alfa Laval Separation, Inc. v. United States*, 175 F.3d 1365, 1367 (1999) (quoting *Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581–82 (Fed.Cir.1996); *Data Gen. Corp. v. Johnson*, 78 F.3d 1556, 1562 (Fed.Cir.1996); citing

*CACI, Inc.-Fed. v. United States,* 719 F.2d 1567, 1574–75 (Fed.Cir.1983)).

It is well-established that when determining whether a government agency acted with a rational or reasonable basis in making a procurement decision, including its evaluation of bids and application of procurement regulations, courts afford agencies wide discretion. *Analytical,* 39 Fed.Cl. at 42 (citing *Bellevue Bus. Serv., Inc. v. United States,* 15 Cl.Ct. 131, 133 (1988); *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 725 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir. 1988)); *Candle Corp. v. United States,* 40 Fed.Cl. 658, 663 (1998) (citing *Lockheed Missiles & Space Co., Inc. v. Bentsen,* 4 F.3d 955, 958–59 (Fed.Cir.1993)); *E.W. Bliss Co. v. United States,* 77 F.3d 445, 449 (Fed.Cir. 1996) (citation omitted). This deference is particularly great when a negotiated procurement is involved and is greater still when the procurement is a "best value" procurement. *Cubic Defense Systems, Inc. v. United States,* 45 Fed.Cl. 450, 458 (1999) (citing *Delbert Wheeler Constr., Inc. v. United States,* 39 Fed.Cl. 239, 247 (1997), *aff'd,* 155 F.3d 566 (Fed.Cir.1998); *Cincom,* 37 Fed.Cl. at 671–72; FAR 15.605(c); *TRW, Inc. v. Unisys Corp.,* 98 F.3d 1325, 1327–28 (Fed.Cir.1996); *E.W. Bliss,* 77 F.3d at 449). Moreover, in situations where the court must "review technical matters that are within the agency's expertise, the highest degree of deference is warranted." *Id.* (citing *G.E. Gov't Servs., Inc. v. United States,* 788 F.Supp. 581, 590 (D.D.C.1992)).

Courts grant such broad discretion because of the "strong presumption that government officials act correctly, honestly, and in good faith when considering bids." *Analytical,* 39 Fed.Cl. at 42 (citing *Cincom,* 37 Fed.Cl. at 671). Accordingly, this court must not substitute its judgment for that of the agency as long as the agency's decision is grounded in reason. *Id.; Synetics,* 45 Fed. Cl. at 5 (citations omitted). This holds true even if "reasonable minds could reach differing conclusions." *Analytical,* 39 Fed.Cl. at 42 (citing *IMS Servs., Inc. v. United States,* 33 Fed.Cl. 167, 179–80 (1995); *Health Sys. Mktg. & Dev. Corp. v. United States,* 26 Cl.Ct. 1322, 1326 (1992)). However, although

the discretion given to agencies extends to the contracting officer's establishment of the competitive range, when the government official establishes a competitive range of one offeror, the decision is subject to close scrutiny. *Impresa Construzioni Geom. Domenico Garufi v. United States,* 44 Fed.Cl. 540, 553 (1999) (citing *Birch & Davis Int'l, Inc. v. Christopher,* 4 F.3d 970, 974 (Fed.Cir.1993)); *W & D Ships Deck Works, Inc. v. United States,* 39 Fed.Cl. 638, 643 (1997).

Moreover, the court, as required by the APA, must conduct a " 'thorough, probing, in-depth review' of the agency's action to determine 'whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.' " *Antarctic,* 46 Fed.Cl. at 154 (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415–16, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971)). Thus, the court must determine whether the agency, pursuant to the Competition in Contracting Act ("CICA"), specified its needs and solicited proposals "in a manner designed to achieve full and open competition for the procurement." 10 U.S.C. § 2305(a)(1)(A) (1994). *See also* 41 U.S.C. § 253(a)(1)(A). Consequently, an agency must assess a competitive proposal " 'solely on the factors and subfactors specified in the solicitation.' " *Candle Corp.,* 40 Fed.Cl. at 663 (quoting 48 C.F.R. §§ 15.305(a), 12–602(b)—(c) (1997); 10 U.S.C. § 2305(b)(1) (1994)). *See also E.W. Bliss,* 77 F.3d at 449 (stating that courts will examine an agency's evaluation "to ensure that it was reasonable and consistent with the evaluation criteria" as well as the applicable statutes and regulations).

**3. Injunction Standard**

If a plaintiff demonstrates that a procurement was unlawful, the issue then before the court is whether to grant permanent injunctive relief. To gain a permanent injunction, plaintiff must establish: (1) actual success on the merits; (2) that it will suffer irreparable injury if injunctive relief were not granted; (3) that, if the injunction were not granted, the harm to plaintiff outweighs the harm to the Government and third parties; and (4) that granting the injunction

serves the public interest. *Hawpe Constr., Inc. v. United States,* 46 Fed.Cl. 571, 582 (2000) (citations omitted); *Ellsworth,* 45 Fed. Cl. at 393 (citation omitted). To establish that preliminary injunctive relief is necessary, a plaintiff must only demonstrate "a likelihood of success on the merits" as opposed to actual success on the merits, in addition to the other three factors required for a court to grant a permanent injunction. *Delbert Wheeler,* 39 Fed.Cl. at 251 (citations omitted).

## B. Merits

### 1. Evaluation of Hardbottom Protection as a Significant Subfactor

Plaintiff contends that the solicitation not only failed to indicate that hardbottom protection was a factor or subfactor, but that it also failed to set forth the significance of hardbottom protection as such. Plaintiff thus concludes that the Corps' evaluation of hardbottom protection as a significant evaluation subfactor was arbitrary, capricious and not in accordance with the applicable statutes and regulations.

 Both the CICA and the Federal Acquisition Regulations ("FAR") require the agency to evaluate competitive proposals solely on the basis of the factors specified in the solicitation. 10 U.S.C. § 2305(b)(1) (1994); 48 C.F.R. § 15.305(a). The FAR extends this requirement to the agency's evaluation of subfactors as well. 48 C.F.R. § 15.305(a). Accordingly, a solicitation must clearly state all significant factors and subfactors as well as their relative importance. 10 U.S.C. § 2305(a)(2)(A)(i) and (ii); 48 C.F.R. § 15.304(d). In the absence of a statement of the relative importance of the factors or subfactors, each factor or subfactor must be weighed equally. *Isratex, Inc. v. United States,* 25 Cl.Ct. 223, 229 (1992) (citations omitted). These requirements echo the "fundamental principle that the Government 'may not solicit proposals on one basis and make award on another basis.'" *Dubinsky v. United States,* 43 Fed.Cl. 243, 266 (1999) (citing *Clean Fl., Inc.,* 88–2 C.P.D. ¶ 411 at 2 (1988); *Idaho Norland Corp.,* 88–1 C.P.D. ¶ 529 at 3, *reconsideration denied,* 88–2 C.P.D. ¶ 103 (1988)). Consequently, this

court may grant an offeror relief if the offeror establishes that the agency evaluated the proposal on a basis different than that announced in the solicitation and that the offeror was prejudiced as a result. *Hydro Eng'g, Inc. v. United States,* 37 Fed.Cl. 448, 471 (1997) (citing *CACI Field Servs., Inc. v. United States,* 13 Cl.Ct. 718, 728 (1987), *aff'd,* 854 F.2d 464 (Fed.Cir.1988)).

 In support of its argument, Bean points out that Section 00100 of the solicitation does not specifically reference hardbottom protection as a significant concern or make a distinction among the various environmental resources the Corps seeks to protect. Plaintiff is correct in this assertion. Section 00100 fails to specifically state the words "hardbottom/reef protection", particularly under the Technical Approach paragraphs or the Oral Evaluation of the Technical Approach paragraphs. Nevertheless, this court has found that " 'a solicitation need not identify each element to be considered by the agency during the course of the evaluation where such element is intrinsic to the stated factors[.]' " *T & S Products, Inc.,* 48 Fed.Cl. at 105 (quoting *Analytical & Research Tech. v. United States,* 39 Fed.Cl. 34, 45 (citation omitted)); *ITT Fed'l Servs. Corp. v. United States,* 45 Fed.Cl. 174, 187, n. 20 (1999) (citation omitted); *Forestry Surveys and Data v. United States,* 44 Fed.Cl. 493, 497 (1999) (stating "[w]hen weighing the merits of a proposal under a specific evaluation factor, an agency 'may consider all matters that offerors would reasonably have believed to be within the scope of the factor.' " *John Cibinic Jr. & Ralph C. Nash Jr., Formation of Government Contracts* 830 (3rd ed.1998) (citation omitted)). Such is the case here.

Section 00100, "Instructions to Bidders", does not specifically refer to "hardbottom protection" as a subfactor under the Technical Approach factor of the solicitation. However, it is evident, when looking at the solicitation as a whole, that "hardbottom protection" is a subfactor of the solicitation. First, the Description of Work of the solicitation states that hardbottom/reef protection is important to the Corps. Second, the contract drawings mark the known hardbot-

tom/reef communities and their proximity to the Operational Boxes. *See, e.g.,* Contract Drawings 1/4 and 11/2. Third, paragraph 3.3.1, under the Instructions to Bidders, requires offerors to describe their proposed technical approaches for executing the work in accordance with the plans and specifications without risking damage to environmental resources. By reference, potential offerors are thus required to look to Section 01410, entitled "Environmental Protection", which sets forth explicit requirements for hardbottom/reef protection under paragraph 3.1.4.11, entitled "Hardground/Reef Protection". Paragraph 3.1.4.11 further refers offerors to Section 02391, entitled "Beach Fill", which sets forth several pages of requirements for hardbottom/reef protection plans and monitoring.

Significantly, in oral argument, as well as in its briefs, NATCO explained that Section 00100, Paragraph 3.3.1 implicitly refers to "hardbottom protection." In relevant part, paragraph 3.3.1 states:

> The proposal shall include a description of how the plant and equipment to be used will not impact the adjacent environmental resources throughout the entire project area. Potential impacts could include turbidity, sedimentation, and mechanical damages. If anchors are to be used, it must be proven that impacts to adjacent environmental resources will not occur. Chaffing of pipelines cannot be allowed if there is a possibility of damage to adjacent environmental resources.

AR 39. In support of its contention, NATCO states:

> These references to anchors and pipeline chaffing in paragraph 3 apply directly to protection of hardbottom/reef resources, not to manatees or sea turtles. In fact, these provisions tie directly into the hardbottom/reef protection requirements of Section 02391, which require the Contractor 'to ensure that anchors are placed so that there is no potential for the anchor to be pulled over hardground resources' and require that the contractor's pipeline 'pro-

vide minimal pipe contact with the hardbottom/reef habitat.'

Intervenor's Reply 9 (citing AR 469–70). See also Tr. 68:18 to 72:5.[10] This court finds NATCO's assertion persuasive, particularly since Bean has failed to present any argument that would effectively rebut NATCO's contention. This court also finds it difficult to believe that Bean, as an admittedly experienced dredging contractor, was unaware that these details, if not an explicit reference to hardbottom/reef protection, at the very least provide implicitly that hardbottom/reef protection is a concern of the Corps' in this procurement. Moreover, plaintiff, in its oral presentation, referenced "hardbottom protection", thereby reflecting some degree of recognition on plaintiff's part.

Thus, although Section 00100 does not explicitly state that "hardbottom protection" is a subfactor in the solicitation, in light of the above and the principle that, when interpreting a solicitation, this court "must give reasonable meaning to all parts of the [solicitation] and not render portions of the [solicitation] meaningless", this court finds that "hardbottom protection" is a subfactor of the Technical Approach concerning protection of environmental resources and that plaintiff was on notice that it was a subfactor. *See Allied Tech. Group, Inc. v. United States,* 39 Fed.Cl. 125, 138 (1997) (stating that courts interpret solicitations essentially in the same manner as contracts) (citations omitted).

Since hardbottom/reef protection has been established as a subfactor of the solicitation of which plaintiff had notice, the court must turn its attention to whether Bean was on notice of the significance the evaluators would place on this subfactor. With regard to this issue, plaintiff submits that nothing in the evaluation criteria put it on notice that hardbottom protection would be singled out by the evaluators as a significant subfactor or that plaintiff's proposal would be significantly downgraded because of its treatment of this subfactor in its oral

---

**10.** "Tr. __:__" refers to the numbered pages and lines of the transcript of the oral argument held on November 3, 2000.

presentation. In support of this contention, Bean states that not only did Section 00100 fail to indicate that hardbottom protection was a major concern, neither did the contract drawings nor Section 01410 of the solicitation. Specifically, Bean maintains that, although the contract drawings indicate the hardbottom/reef areas, Contract Drawings 4/1 and 4/2 show that the borrow area is located 400 feet from the hardbottom/reef resources, and Contract Drawing ¼ indicates that the loading area is far from the hardbottom/reef communities. Bean concludes that these drawings demonstrate that actual construction would not take place near the hardbottom/reef communities, although the pipeline corridor would have to cross some reef areas. Bean contrasts these conclusions with another interpretation of the contract documents, stating that the contract drawings indicated other environmental concerns in the borrow area, such as water turbidity and marine life, which Bean did discuss in its presentation. Bean also points out that Section 01410, designated "Environmental Protection", only refers to hardground protection in ten lines.

Plaintiff's argument, however, is without merit. A review of the record demonstrates that hardbottom/reef resources was of predominant importance in this procurement. From its inception, the Corps indicated that protection of hardbottom/reef resources was a primary concern. As stated, both the Commerce Business Daily and the Description of Work of the solicitation stated that "[p]rotection of the environment, especially the existing reef system, is of paramount importance." AR 20, 487a. No other environmental concern is singled out by the Description of Work in such emphatic terms. The predominant importance of the reef communities can be found when the aforementioned language is compared to both documents' references to sea turtles. With regard to sea turtles, the documents state: "It is anticipated that this project may be constructed during the turtle-nesting season and precautions will have to be taken." *Id.* This language is relatively lackluster when compared to the language regarding reef systems and, taken together, the sentences reflect that while sea turtles are an environ-

mental concern, protection of the reef system, which includes the hardbottom, is most important to the Corps. Furthermore, Sections 01410, 02391, and 02278 of the RFP are replete with references to the hardbottom/reef resources and instructions to the potential contractor on how to protect and monitor these communities. Although Bean correctly points out that Section 01410, has only ten lines that are specifically dedicated to hardground/reef protection, plaintiff overlooks the fact that at the end of the paragraph, the reader is directed to Section 02391, designated "Beach Fill". AR 369. Section 02391 is abundant with references to hardbottom/reef communities. There are several pages devoted to requirements the contractor must meet to protect these resources. The importance of this matter is further demonstrated by the specificity of the paragraphs. For example, Section 02391 directs the contractor not to simply protect the hardbottom resources, but also how to use the proper equipment, such as hopper dredges, anchors, cables, or dragheads, to that end and to monitor its equipment usage to prevent damaging the resources.

Bean seeks to refute these findings by stating that, although it admits that the Description of Work states that protection of the reef system is of paramount importance, the proposals were not being evaluated against either the Description of Work or the other cited RFP provisions, but, rather, against the evaluation factors in Section 00100. While it is true that Section 00100 set forth the evaluation procedures for the proposals and the instructions to offerors on how to present their proposals, this court must look at the RFP in its entirety to ascertain the intent of the parties. *Allied,* 39 Fed.Cl. at 138. Accordingly, this court, as well as the parties, must construe the solicitation " 'so as to harmonize and give meaning to all its provisions.' " *Id.* (quoting *Thanet Corp. v. United States,* 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *ITT Arctic Servs., Inc. v. United States,* 207 Ct.Cl. 743, 751–52, 524 F.2d 680 (1975); *accord Firestone Tire & Rubber Co. v. United States,* 195 Ct.Cl. 21,

30, 444 F.2d 547, 551 (1971)). *See also Stratos Mobile Networks USA, LLC v. United States*, 213 F.3d 1375, 1380 (Fed.Cir.2000) (stating that the solicitation must be read like any contract, "in light of its purpose and consistently with common sense.") (citation omitted). Consequently, both the Description of Work and the previously cited RFP provisions are relevant to this matter and demonstrate that the Corps put offerors on notice that hardbottom/reef resources were of significant importance. *See T & S Products, Inc.*, 48 Fed.Cl. at 105–06 (noting that numerous provisions throughout the solicitation on branding were sufficient to put offerors on notice that the agency would view branding as a significant issue in its evaluation). In fact, the cited provisions of the solicitation indicate how integral protection of the hardbottom/reef community is to the project. Nearly every action of the equipment is governed so as not to damage these resources.[11] When a subfactor is so intertwined with other elements of the solicitation, it would be difficult to ignore that an offeror was on notice of its crucial significance. *See Antarctic Support Associates v. United States*, 46 Fed.Cl. 145, 155–56 (2000) (noting that the IT/Communications factor was an overriding aspect of the proposal and part of the integrated whole, thus, offerors were on notice that they needed to address it in their proposals).

In light of the above, this court finds not only did the Corps disclose that hardbottom/reef protection was a subfactor, the Corps also provided plaintiff with notice that hardbottom/reef protection was a significant subfactor that would carry pivotal weight in the Corps' evaluation of plaintiff's proposal. As such, the Corps' decision to evaluate the proposals on how significantly or in-depth an offeror discussed hardbottom/reef protection in its oral presentation was reasonable and rational.

---

**11.** Bean has also argued that the work and equipment were located a distance away from actual construction, such that any adverse impact to the hardbottom/reef resources would be minimal. Aside from the Corps' absolute right to designate hardbottom/reef protection a paramount concern irrespective of proximity, the

### 2. Evaluation of Bean's Technical Approach

Bean contends that the Corps improperly scored its proposal under the Technical Approach. Specifically, Bean claims that there is no rational explanation for the Corps' consensus scores for the factors relating to: (1) transference of material from the dredge to area inside the pipeline corridor; (2) transference of material from dredge to area outside the pipeline corridor; and (3) description of breakwater construction. With regard to all three of these factors, Bean also submits that the consensus scores in these areas are anomalous when one notes that Bean received a higher score on the related subfactor of its method of accomplishing each of these tasks in seas three feet and above. In support of its contention, plaintiff relies upon the well-established proposition that an agency must articulate "a rational connection between the facts found and the choices made." *Antarctic*, 46 Fed. Cl. at 154 (citing *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc.*, 462 U.S. 87, 105, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983); *NKF Eng'g, Inc. v. United States*, 9 Cl.Ct. 585, 594 (1986), *order vacated on other grounds*, 805 F.2d 372, 378 (Fed.Cir. 1986) (citing *Overton Park*, 401 U.S. at 416, 91 S.Ct. 814)); *Redland Genstar, Inc. v. United States*, 39 Fed.Cl. 220, 231 (1997) (citations omitted); *Eng'g and Computation, Inc.*, B–261658, 95–2 C.P.D. ¶ 176 at 3 (Oct. 16, 1995).

With respect to consensus scoring, defendant has submitted the Declaration of George Cooper, Chair of the Technical Evaluation Team ("TET"), in connection with this proposal. Defendant has presented this declaration in an effort to answer plaintiff's questions and explain the Corps' rationale in making the consensus score decisions. In addition, defendant has filed supplemental materials further explaining the Corps' internal procedures governing consensus scores, in response to this court's request during oral

court takes note of and is instructed by the Government's admonishment that although the coral reefs are located a distance away from the areas where dredging takes place, if the dredging stirs up sand that then floats and lands on the coral, the coral, a living animal, will die from suffocation. Tr. 43:15 to 44:2.

argument.[12] The declaration of Mr. Cooper explains the TET's consensus scoring process:

a. The individual evaluators determined an initial score on each Technical Approach subfactor based on the slides and other information presented by the offerors during their oral presentations.

b. The TET then met as a group following the conclusion of each offeror's oral presentation and discussed the scoring of each of these subfactors and reached a consensus score on each subfactor.

c. As a result of the discussions at this meeting, some of the individual evaluators revised their initial scores on certain subfactors. Examples can be found by comparing individual evaluator score sheets (AR at 1403, 1440, 1568, 1609) to the summary of individual and consensus scores found at AR 1346.

d. Each evaluators' final individual scores on the eight subfactors under the Technical Approach factor are reflected in the summary tables of individual evaluation and consensus scores. AR at 1055 (NATCO) and 1346 (Bean Stuyvesant).

Def.'s Opp., Cooper Dec. at ¶ 4. The agency procedures governing consensus score determinations prohibit the use of averaging to arrive at a consensus score. Specifically, the Army Federal Acquisition Regulation Supplement ("AFARS"), at § 15.305(a)(3), states:

*Technical evaluation.* Do not average or otherwise manipulate individual evaluator or unit scores to produce a single raw score or subfactor. Establish scores by evaluator consensus and not by vote. When divergent evaluations exist, and none of the evaluators have misinterpreted or misunderstood any aspects of the proposals, consider providing the SSA with written majority and minority opinions.

Def.'s Supp. Materials, attachment 1. The Army Material Command Pamphlet, in addition to prohibiting the averaging of individual evaluation results to constitute a consensus, defines consensus as requiring "a meeting of the minds on classifications, deficiencies, strengths, weaknesses, and risks." *Id.,* attachment 2.

 The GAO has rendered decisions in a long line of cases that address the issue of improper evaluation of proposals and whether such is evidenced by consensus scores differing from individual evaluator ratings. This court finds these cases instructive and well-reasoned and will follow their rationale in the resolution of this issue.[13] These

**12.** Plaintiff has not objected to defendant's submission of either the declaration or the supplemental materials requested by this court. Furthermore, it is important to note that although the scope of review of an agency's procurement actions is generally limited to the administrative record, *Marine Hydraulics Int'l, Inc. v. United States,* 43 Fed.Cl. 664, 670 (1999) (citing *Camp v. Pitts,* 411 U.S. 138, 142, 93 S.Ct. 1241, 1244, 36 L.Ed.2d 106 (1973)), there are certain limited instances where a court may allow the parties to supplement the administrative record, *id.* (citing *Aero Corp., S.A. v. United States,* 38 Fed.Cl. 408, 411 (1997)). This court has consistently considered the following factors set forth in *Esch v. Yeutter,* 876 F.2d 976 (D.C.Cir.1989), in making its "extra-record" evidence determination:

(1) when agency action is not adequately explained in the record before the court; (2) when the agency failed to consider factors which are relevant to its final decision; (3) when an agency considered evidence which it failed to include in the record; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues clearly; (5) in cases where evidence arising after the agency action shows whether the decision was correct or not; (6) in cases where agencies are

sued for a failure to take action; (7) in cases arising under the National Environmental Policy Act; and (8) in cases where relief is at issue, especially at the preliminary injunction stage. *Myers Investigative and Security Servs., Inc. v. United States,* 47 Fed.Cl. 288, 294 (2000) (quoting *Cubic Applications, Inc. v. United States,* 37 Fed.Cl. 339, 342 (1997) (*Cubic I* ) (quoting *Esch,* 876 F.2d at 991)). *See also Marine Hydraulics,* 43 Fed.Cl. at 670; *Pikes Peak Family Housing, LLC v. United States,* 40 Fed.Cl. 673, 677 (1998); *Mike Hooks, Inc. v. United States,* 39 Fed.Cl. 147, 156 (1997); and *GraphicData, LLC v. United States,* 37 Fed.Cl. 771, 779 (1997). Because the method of determining consensus scores is not in the administrative record, both documents provided by defendant will assist this court in its determination of whether the Corps' award decision was rational, and injunctive relief is at issue. Therefore, this court has allowed defendant's "extra-record" evidence.

**13.** While these decisions are not binding on this court, this court accords deference to the Comptroller General decisions in recognition of GAO's expertise and role in the resolution of contested procurement decisions. *Bean Dredging Corp. v. United States,* 22 Cl.Ct. 519, 522 (1991) (citing

Comptroller General cases reflect that the mere fact that a consensus score may deviate from the agency's individual evaluators' scores, does not, *per se,* render the final consensus rating questionable. In *Symtech Corp.,* the Comptroller General explains the reasoning behind this proposition:

Agency evaluators may meet to discuss the relative strengths and weaknesses of proposals, as was done here, in order to reach a consensus rating, which often differs from the ratings given by individual evaluators, since such discussions generally operate to correct mistakes or misperceptions that may have occurred in the initial evaluation. *Resource Applications, Inc.,* B–274943.3, Mar. 5, 1997, 97–1 CPD ¶ 137 at 5. The overriding concern in the evaluation process is that the final scores assigned reasonably reflect the actual merits of the proposals, and not that they be mechanically traceable back to the scores initially given by the individual evaluators.

*Symtech Corp.,* 2000 WL 1277971, *5 (Comp. Gen.) (Aug. 21 2000). *See also Ocean House Builders,* B–283057, 99–2 CPD ¶ 53 at 4 (Sept. 21, 1999); *Warvel Products, Inc.,* B–281051.5, 99–2 CPD ¶ 13 at 11 (July 7, 1999). The GAO further explains, in *Dual, Inc.,* that "even if the final consensus ratings were not agreed to by each individual evaluator, this would not provide a sustainable basis of protest in the absence of a showing that the final ratings did not accurately reflect the merits of the proposal." *Dual, Inc.,* B–252593.3, 93–2 CPD ¶ 190 at 7–8 (Aug. 31, 1993). Thus, the primary issue before this court is whether the consensus scores for plaintiff's proposal reasonably reflect the merits of plaintiff's oral presentation on its Technical Approach.

To appropriately and efficiently address this issue, the court will combine Bean's consensus argument with Bean's contention that its oral presentation was improperly downgraded since Bean did address hardbottom protection in its oral presentation and accompanying written materials. Plaintiff defends its position by pointing out that at its oral presentation, [ ], a representative of plain-tiff's subcontractor, [ ], discussed hardbottom/reef monitoring in detail. Plaintiff also asserts that if the Corps had any questions regarding plaintiff's coverage of hardbottom/reef protection in its presentation, the Corps could have simply raised this concern during the obligatory question and answer session.

Plaintiff received a score of 280 points out of a possible 500 points for the Technical Approach portion of its oral presentation. Plaintiff challenges the consensus scores that effectively reduced its score by 180 points. The Corps set forth its rationale for its decision in both the Best Value Technical Assessment document, and the Source Selection Determination memorandum. The Best Value Technical Assessment document states:

Bean Stuyvesant, L.L.C. received 280 points out of a maximum of 500 points for this factor. Due to the environmental concerns and complexity of the work, Bean Stuyvesant's oral presentation demonstrated a lack of understanding the purpose of the oral presentation. They did not assure the Corps that they understood the environmental risks and showed little detail of how they would handle them. Bean Stuyvesant spoke more about sea turtles protection, which is a relatively minor concern in the project area, and hardly mentioned hardbottom protection, which is a major concern.

AR 1709. It also states that plaintiff lost points for the following reasons:

1. *Pipeline*—Failure to discuss mobilization/demobilization, installation, mooring, and maintenance of pipeline.

2. *Pipeline in access corridor*—Failure to discuss coordination with DERM for placement of pipeline including buoy placement and care to assure there are no cable chaffing on hardbottom.

3. *Breakwater*—Failure to discuss coordination with DERM for site investigation for placement of spuds. Failures to discuss equipment draft, prop wash and care to assure there are no cable drag on hardbottom. Failure to dis-

*Honeywell, Inc. v. United States,* 870 F.2d 644, 647–48 (Fed.Cir.1989); *Howell Constr., Inc. v.* *United States,* 12 Cl.Ct. 450, 452 (1987)).

cuss excavation of material at breakwater site.

*Id.* The Source Selection Determination document stated, in relevant part:

> Bean Stuyvesant's oral presentation demonstrated a significant lack of understanding as to the purpose of the oral presentation. They did not assure the Corps that they understood the environmental [sic] risks and showed little detail of how they would handle them. Bean Stuyvesant spoke more about sea turtle protection, which is a relatively minor concern in the project area and hardly mentioned hardbottom protection, which is a major concern.
>
> An important indicator which significantly demonstrated the firm's lack of understanding of the care that must be taken to ensure that no damage occur to the environmental resources was their selection of their subcontractor for construction of the breakwater. The subcontractor's past performance documented an unacceptable past performance record in areas of environmental compliance, quality control and responsiveness to customer's needs, which, in effect, would increase the risk of damage to the environmental resources if the contract were awarded to Bean Stuyvesant.

AR 1651.

The Corps' findings are supported by the record. Throughout the written materials created by [ ] and submitted as part of plaintiff's written materials accompanying its oral presentation, [ ], in the seven pages that discussed Technical Approach, focused almost exclusively on *monitoring* (as opposed to protecting) the hardbottom/reef resources. AR 1013–20. Mr. [ ]'s oral presentation on [ ]'s Technical Approach plan lasted approximately ten minutes and he addressed many of the same issues as presented in [ ]'s written materials. Mr. [ ] also stated that he recognized that there are sensitive reefs near the borrow area and operational boxes. Bean Videotape 0:56:33 to 1:28:30.

### a. Transference of Dredge Material to Area Inside the Pipeline Access Corridor

For the subfactor, "Transfer of Material Dredge to Area—Inside", Bean received only 20 points out of a possible 85. AR 1346. Plaintiff claims that the record is void of any explanation for how this consensus score was reached, given the evaluators' individual scores of 70, 20, 30, 30, 65, and 40. Bean also contends that this matter raises further questions when one considers that one of the evaluators indicated plaintiff's final consensus score for this subfactor would be 65 points rather than 20.

A review of the administrative record reveals the reasoning behind the evaluators' consensus score. The evaluation sheet states that plaintiff received a score of 20 points because "no discussion of buoy cable impacts, coordination with DERM for placement of pipeline in corridor." AR 1373. The individual evaluation that plaintiff questions, despite its references to the strengths of Bean's proposal, states, under the category "weaknesses/significant weaknesses and deficiencies," that there was "no description of mooring of pipe, connectors", among other things. AR 1535–36. Moreover, the other evaluators' comments mirror this individual evaluator's notations. The TET's comments include notations that Bean did not discuss buoy cable impacts, coordination with DERM for placement of pipeline in the corridor, and prevention of cable scrapes from buoy cables along the pipeline, and removal of collars or cable impacts. Two of the evaluators designated plaintiff's failures as deficiencies and significant weaknesses for these failures. Given the appropriate significance the evaluating team placed on the offeror's description of how the placement and maintenance of the equipment would affect the hardbottom, it is not unreasonable that Bean's failure to discuss these matters, as indicated by both the individual evaluation sheet and the oral presentation videotape, would result in a consensus score of 20 points. In the oral presentation, although Mr. Taylor, like Mr. [ ], stated that he recognized that reef habitat is important to South Florida and that plaintiff would document information to accomplish the project with environmental concerns in mind, he did not go into any explicit detail of how the equipment would be used in a manner to protect the hardbottom.

### b. Transference of Material to Dredge Area Outside the Pipeline Access Corridor

For the subfactor transferring material to the dredge area outside the pipeline access corridor, the TET gave plaintiff a consensus score of 35 points. The individual evaluators gave plaintiff three scores of 30 points and three scores of 40 points. Plaintiff challenges these individual scores and the resulting consensus score because the administrative record shows that evaluators [ ] and [ ], gave plaintiff an initial score of 40 and 50 points, respectively, whereas their final evaluation score states that they gave plaintiff 30 and 40 points, respectively. As stated previously, the consensus score need not be traceable back to the individual scores. *Ocean House Builders*, B–283057, 99–2 CPD ¶ 53 at 4. Moreover, the administrative record again supports the TET's reasoning for its consensus score for plaintiff on this subfactor. The Group Consensus evaluation sheet states that plaintiff did not mention mobilization, installation, and maintenance of dredge, pipeline, pumpout, including mooring. This is reiterated in the Best Value Technical Assessment document. Several evaluators noted that plaintiff wholly failed to discuss mobilization, installation, and maintenance of dredge, pipeline pumpout, including, mooring and searing. As stated above, the evaluators' comments are based upon Bean's oral presentation and Bean's receipt of a score of 35 is not unreasonable given the significance of hardbottom as a subfactor, its relationship to this subfactor and the lack of detail Bean gave this subfactor in its presentation.

### c. Construction of the Breakwater

Bean also sets forth the argument, without more, that the administrative record has no rational explanation for the points assigned plaintiff for the breakwater construction subfactor. As with the other evaluated subfactors, the administrative record sets forth the evaluation team's reasoning behind its award of a consensus score of 20 out of a possible 85 points to plaintiff for this subfactor. Bean received numerous negative comments for its discussion of construction of the breakwater. The Group Consensus evaluation sheet and

the individual evaluators stated that plaintiff's subcontractor failed to discuss anchoring, mooring, drafts, propwash, excavation methods for the mattress, and anchoring of barges and cables. As before, two of the evaluators referred to these failures as "deficiencies", rather than weaknesses. AR 1449, 1492. Again, the evaluators' language for both of these subfactors indicates a complete failure, on Bean's part, to discuss these methods and the videotape of plaintiff's oral presentation does support the TET's findings.

The above discussion demonstrates that the administrative record does present a rationale for the TET's consensus scores for the above-questioned subfactors. As stated, the consensus score is determined by a discussion between the individual evaluators and this score is not necessarily traceable to the individual evaluators' scores. *Symtech Corp.*, 2000 WL 1277971, *5 (Aug. 21, 2000). Therefore, it is not the individual evaluator's final score that is of concern, but rather, the consensus score. Consequently, even if the overall evaluation chart has an error with regard to any individual evaluation score, it would be harmless error under these circumstances. Furthermore, there is no indication in the record that the individual evaluators misinterpreted or misunderstood any aspects of the proposal to an extent where divergent views should have led the TET to file a separate written rationale explaining the majority and minority opinions, in accordance with the above-stated internal policies governing consensus scores.

A review of the administrative record has assured this court that the agency examined the relevant data "and articulat[ed] a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Redland Genstar, Inc. v. United States*, 39 Fed.Cl. 220, 231 (1997) (quoting *Rainbow Navigation, Inc. v. Dept. of Navy*, 783 F.2d 1072, 1080 (D.C.Cir. 1986) (Scalia, J.) (citations and internal quotations omitted)). Although the evaluator comments do not expressly state the words "hardbottom protection", this agency has, as reflected in the above discussion, demonstrated that the average dredging contractor

would understand that language speaking of chaffing and cable drags implicitly refers to the hardbottom and how such actions would impact the hardbottom. It is plain that the evaluators' comments all refer to plaintiff's failure to discuss how its equipment, such as pipelines, anchors, cables and barges, would impact the hardbottom. Even though Mr. [ ] discussed hardbottom monitoring and very briefly discussed hardbottom protection and while Mr. Taylor stated that he recognized the importance of protecting the hardbottom/reef communities, their presentations were inadequate to demonstrate how plaintiff would protect the hardbottom. Given that Bean was on notice that protection of the hardbottom was a significant subfactor, it is not unreasonable that the evaluation team significantly downgraded plaintiff's oral presentation score in the absence of a detailed discussion by Bean on matters directly related to this subfactor.

 This court defers to agencies in matters of technical adequacy of proposals upon a showing that the agency's decision has a reasonable basis. *Cube Corp. v. United States,* 46 Fed.Cl. 368, 386 (2000). In light of the administrative record, plaintiff's contentions that the consensus scores are questionable and its overall score for its Technical Approach was improperly downgraded amounts to a mere disagreement with the agency's evaluation. This alone is not sufficient to establish that the Corps' evaluation was unreasonable or arbitrary and capricious, particularly when the administrative record provides ample evidence supporting the Corps' conclusion. *Id.* (citing *Lockheed Missiles & Space Co. v. Bentsen,* 4 F.3d 955, 959 (Fed.Cir.1993) (citations omitted); *TRW, Inc.,* B–282162.2, 1999 WL 485030, at *5 (C.G. June 9, 1999); *Tech. & Administrative Servs. Corp.,* B–279828, 1998 WL 681275, *2 (C.G. July 24, 1998)); *Synetics, Inc. v. United States,* 45 Fed.Cl. 1, 10 (1999) (citing *Informatics Corp. v. United States,* 40 Fed. Cl. 508, 513 (1998) (citations omitted)). Plaintiff has presented no credible evidence to refute the administrative record and the rationales stated for the questioned consensus scores, leaving the court with an offeror's opposition to an agency decision with a demonstrated reasonable basis.

Plaintiff has also attempted to discredit the Corps' scoring decision by asserting that "[t]his situation easily could have been avoided if the Corps' panel had raised this concern during Bean's oral presentation." Pl.'s Mot. 22, n.5. Plaintiff relies upon FAR provision § 15.306, "entitled "Exchanges with offerors after receipt of proposals"" for support. *Id.* FAR § 15.306, in relevant part, states:

(a) Clarifications and award without discussions.

(2) If award will be made without conducting discussions, offerors may be given the opportunity to clarify certain aspects of proposals (e.g., the relevance of an offeror's past performance information and adverse past performance information to which the offeror has not previously had an opportunity to respond) or to resolve minor or clerical errors.

(b) Communications with offerors before establishment of the competitive range. Communications are exchanges, between the Government and offerors, after receipt of the proposals, leading to establishment of the competitive range. If a competitive range is to be established, these communications—

(2) May be conducted to enhance Government understanding of proposals; allow reasonable interpretation of the proposal; or facilitate the Government's evaluation process. Such communications shall not be used to cure proposal deficiencies or material omissions, materially alter the technical or cost elements of the proposal....

(3) Are for the purpose of addressing issues that must be explored to determine whether a proposal should be placed in the competitive range. Such communications shall not revise its proposal, but may address—

(i) Ambiguities in the proposal or other concerns (e.g., perceived deficiencies, weaknesses, errors, omissions, or mistakes)

Plaintiff overlooks the permissive nature of the language in this provision. This provision does not require the Corps to discuss any concerns that it may have had regarding

Bean's oral presentation, although the Corps could have queried Bean during the question and answer session to obtain clarification. Also, Bean contends that the evaluation team never raised hardbottom/reef protection during the question and answer session. This is not entirely true. During the question and answer session regarding Bean's Technical Approach presentation, the evaluation team asked Bean to: "Clarify the performance of dredging in waffle pattern in the borrow area to minimize turbidity and sedimentation impacts to surrounding reefs." Mr. Taylor's response was to draw a description and to verbally refer to the protection of sea turtles and how dragheads, trenches and program lines would operate. Thus, Bean was given a chance to clarify this point in relation to hardbottom/reef impacts. If the evaluation team had asked Bean a question regarding each of the points it missed in its discussion of the subfactors and their relation to hardbottom protection, this could have amounted to a revision of Bean's proposal, an action prohibited under FAR § 15.306. In light of the above, this court does not find that the Corps was required to raise a myriad of questions with regard to Bean's presentation or that the Corps' failure to do so led to a significant negative evaluation of Bean's proposal as plaintiff contends. Rather, Bean's own presentation and discussion, as discussed above, is what led to Bean's poor Technical Approach score.

Finally, Bean asserts that the administrative record reveals no explanation for why plaintiff would receive a low consensus score for the above-mentioned subfactors, while receiving a high score for the related subfactor of an offeror's ability to accomplish the above subfactors, such as transferring material dredge to the area outside of the pipeline access corridor. Plaintiff is incorrect. George Cooper, Chairman of the TET, states that plaintiff's assertion is based upon a misinterpretation of the record and explains the Corps' rationale behind the scoring. Def.'s Opp., Cooper Dec. ¶ 3–4. Mr. Cooper states:

 a. The TET evaluated the offerors' proposals with respect to how they proposed to perform the work without damaging environmental resources in connection with the evaluation of each of the four 85–point subfactors.

 c. The TET did not specifically consider the potential for damage to environmental resources in the evaluation of the four 40–point subfactors relating to capability to perform in seas three feet or higher. Rather, our evaluation of these subfactors focused on the ability of the equipment proposed by the offerors to operate in heavier (three feet and above) seas. The ability to operate in heavier seas is a different qualification from the ability to operate without damaging the environment. The Source Selection Plan focuses on the contractor's equipment for scoring the 40 point categories (AR 1673, 1675, 1678 and 1680).

*Id.* at ¶ 3. Mr. Cooper's explanation is credible and is also supported by the administrative record. Paragraphs 3.3.1.1 to 3.3.1.4 of Section 00100 of the solicitation all include the statement: "It is not unusual for waves that are 3 feet high and above to occur in the project area; therefore, a detailed description of how plant and equipment to be used and the method of accomplishing the work in rough weather is needed." AR 39; 43. This language does not indicate that the offeror's ability to protect the environmental resources is at issue; rather, it indicates a concern with whether the offeror can perform the work, such as extraction of sand, in seas three feet and above. Furthermore, the Group Consensus evaluation sheets state the TET's rationale behind the high consensus scores. The evaluation team noted that the majority of the time, plaintiff could perform in seas exceeding three feet. It also noted when Bean could only perform in seas of three feet and scored plaintiff accordingly. Because the record demonstrates that the Corps considered all of the relevant facts with regard to these subfactors, this court finds that the Corps' basis for the consensus scores is not unreasonable, despite the variance between these subfactors and their respective related subfactors. *See Redland Genstar, Inc.,* 39 Fed.Cl. at 231 (citation omitted).

### 3. Evaluation of NATCO's Proposal

Plaintiff suggests that the Corps did not give Bean's proposal the same even-handed evaluation that it gave to NATCO. Plaintiff maintains that this disparate treatment is notable when one compares Bean's and NATCO's consensus scores and that NATCO's score was not downgraded for weaknesses in its discussion of the hardbottom. Plaintiff states that "[w]here Bean's consensus score almost universally trended towards the lowest individual scores, NATCO's consensus scores almost universally trended towards the highest individual scores." Pl.'s Mot. at 31.

As discussed, the "overriding concern in the evaluation process is that the final scores assigned reasonably reflect the actual merits of the proposals, and not that they be mechanically traceable back to the scores initially given by the individual evaluators." *Symtech Corp.*, 2000 WL 1277971 (Comp.Gen.) (Aug. 21, 2000). Thus, the essential inquiry is whether NATCO's final consensus scores are indicative of the actual merits of its proposal. Plaintiff's claim is not supported by the administrative record, which demonstrates that the Corps evaluated NATCO's proposal in the same manner that it evaluated Bean's, albeit, with different results.

#### a. Extraction of Material from Borrow Area

Plaintiff contends that an example of the disparate treatment given to NATCO and Bean during evaluation of their respective proposals is seen when Bean received a consensus score of 65 points for the subfactor concerning extraction of material from the borrow area, despite the notation of strengths, whereas NATCO received a perfect score of 85 points, with no notations of strengths. Plaintiff claims that the record has no rational basis for this apparent discrepancy. The administrative record indicates that only one individual evaluator made a comment regarding NATCO's presentation of this subfactor. It stated that NATCO had failed to discuss rock disposal. There were no strengths indicated on the individual evaluation sheets. The Group Census evaluation sheet for NATCO also had no notations re-

garding the merits of NATCO's presentation on this subfactor. For Bean, the Group Consensus evaluation sheet for this subfactor notes a consensus score of 65 and that Bean met all requirements. Despite the numerous strengths indicated, two of Bean's evaluation sheets note weaknesses. One evaluator commented that Bean provided a general description rather than a detailed one. Another evaluator noted, as a significant weakness, that Bean failed to discuss placement of buoys. One evaluator also noted that Bean exceeded the ability to control turbidity.

The administrative record is not devoid of rationale supporting the TET's conclusion. The Group Consensus document states that Bean met all requirements. For this, Bean received the highest score that a proposal can receive when it meets all of the requirements, as opposed to a higher score ranging from 66–85 when an offeror's proposal on a factor is outstanding and goes beyond the solicitation requirements. See e.g. AR 1447–48. Furthermore, Bean's individual evaluation sheets do note more weaknesses than NATCO's individual evaluation sheets. Although plaintiff disputes the Corps' scoring for this matter, it offers no support for its conclusion. As before, plaintiff's claim amounts to merely a disagreement with the Corps' consensus scores. This alone does not justify finding that the Corps unfairly evaluated plaintiff's proposal, particularly when a rationale for the Corps' decision can be determined from the record. *See Ocean House Builders*, B–283057, 99–2 CPD ¶ 53 at 4; *Warvel Products, Inc.*, B–281051.5, 99–2 CPD ¶ 13 at 11.

#### b. Breakwater Construction

Bean also points out to the court that for the breakwater construction subfactor, several of the individual evaluators' scores on their evaluation sheets are different than the scores reported by the Corps on the chart setting forth each individual evaluator's score and NATCO's final consensus score of 75 points. Pl.'s Mot. 33. Specifically, plaintiff notes that the final chart quotes scores of 75, 75, 75 and 75 for [ ], respectively. *Id.* For each of these scores, plaintiff recites the differing scores recorded on the individual

evaluators' evaluation sheets for this subfactor. While this may be true, plaintiff misses the point regarding consensus scoring. This court is concerned with whether the *consensus* score reflects the merits of the offeror's proposal, not the individual evaluators' scores. *Symtech Corp.*, 2000 WL 1277971 (Comp.Gen.) (Aug. 21, 2000). Plaintiff has not challenged NATCO's consensus score with regard to this factor, only the differences in the individual evaluators' scores. As such, the errors that plaintiff notes do not effectively support its argument that NATCO was scored differently and more favorably than Bean and do not demonstrate that the Corps' consensus scoring was improper or unreasonable.[14]

### c. Evaluation of Hardbottom Protection

Plaintiff is perhaps most concerned with the Corps' evaluation of NATCO's proposal with regard to the hardbottom protection subfactor. Plaintiff contends that despite the administrative record reflecting that the evaluators found weaknesses in NATCO's discussion of the hardbottom, NATCO was not downgraded for this factor. Both defendant and intervenor challenge plaintiff's interpretation of the record. Defendant notes that while one evaluator noted a weakness in NATCO's presentation with regard to hardbottom protection, three other evaluators disagreed and awarded NATCO a perfect score; however, the TET deducted five points from NATCO's score. Defendant's explanation for this in its brief was that the "only reasonable interpretation is that [ ] and [ ] persuaded the other evaluators that a perfect score was not warranted. Thus, any weaknesses are reflected in NATCO's final consensus score." Def.'s Opp. 16. When questioned at oral argument about the disparity between the points deducted from NATCO and Bean regarding hardbottom protection, defendant's counsel stated:

**14.** Both defendant and intervenor also point out to the court that NATCO's individual evaluator scores varied in some instances because some evaluators were confused as to whether the solicitation required the breakwater subcontractor to tie the mattresses (weighted support pieces) together. The administrative record indicates that this was indeed the case, and can explain some

I think it's because that [sic] NATCO, although talking about the points of mooring and anchoring, didn't describe it as—in sufficient detail to earn it a perfect score; but, it did discuss those points more than Bean Stuyvesant did. So, its [sic] not simply a question of if you talk about it at all, you get a perfect score. You have to explain in detail what you're going to do and sometimes NATCO did not describe it in enough detail, to earn a perfect score. For example, I'll point out in its management plan, it didn't—it lost five points for failure to—failure to discuss its dive plan. The Corps applied the same rule, as far as if you talk about something, you're allowed to ask a question. The Corps could ask a question for clarification. But since NATCO neglected to talk about its dive plan at all, the Corps did not ask the question, then NATCO is penalized some points. Here, when Bean Stuyvesant—if Bean Stuyvesant had talked about its plan for protecting the hard bottom—not just monitoring the hard bottom, but protecting it, then the Corps could have asked them a question. But since Bean Stuyvesant didn't, it lost points.

Tr. 48:19 through 49:15. In its brief, intervenor states that:

The TET also carefully reviewed NATCO's Technical Approach with respect to protection of the hardbottom/reef resources. In doing so, it noted some minor omissions, including those identified by B/S. As the TET report indicates, NATCO lost points in those areas. AR at 1055, 1711. However, as the consensus scores of the six technical evaluators and the TET report indicate, NATCO understood the environmental risks and 'thoroughly discussed, in great detail,' how it would address them.

Intervenor's Reply 24–25.

Both defendant's and intervenor's remarks are supported by the administrative record.

of the discrepancies of which plaintiff complains. *Compare* AR 1296 (noting as a deficiency that NATCO was not aware that mattresses must be sewn together) *with* AR 1087, the Group Consensus evaluation sheet (stating that the geotech was wrong, the mattresses were not required to be tied together and crossing out a notation of a deficiency for this issue).

The Best Value Technical Assessment document and the Source Selection Determination memorandum both explain the Corps' reasoning behind its overall decision regarding NATCO's proposal, mainly that:

NATCO was rated outstanding in every factor but one on their Technical Presentation. NATCO's oral presentation demonstrated a full understanding of the purpose of the presentation. NATCO's presentation assured the Corps they understood the environmental risks and thoroughly discussed, in great detail, how they would handle the risks.... NATCO also lost points inside and outside the pipeline access corridor for not discussing:

1. Visual inspections of pipeline when divers could not dive due to weather.

2. The disposal of rock at the rock disposal area.

3. Assuring that cables and buoys do not chaff any environmental resources inside and outside the pipeline corridor.

AR 1711. See also AR 1648–52. The Group Consensus evaluation sheets are simply not detailed and do not note many strengths or weaknesses in NATCO's oral presentation on its Technical Approach. However, the individual evaluation sheets, as the parties have mentioned, do make some notations of NATCO's weaknesses. The comments reflect the Best Value Technical Assessment's language. Evaluators noted that NATCO did not discuss the hardbottom or chaffing; was weak in discussing the hardgrounds; and did not address buoys at the pipeline corridor to prevent damage to the hardbottom. In fact, one evaluator even gave NATCO an initial rating of 20 points for the subfactor regarding the method of transferring material from the dredge to the placement area inside the pipeline corridor before discussions; after discussions, this evaluator changed the score to 85 points.

These excerpted comments stand in stark contrast to the numerous comments the evaluators made concerning Bean's oral presentation with regard to hardbottom protection, discussed *supra*. Although this court finds it questionable that the Corps would only deduct only five points from NATCO's score with regard to its discussion on hardbottom protection while deducting approximately 180 points from Bean's score with respect to this same issue, the individual evaluation sheets and the oral presentation do note that, for the most part, NATCO did discuss in detail how it would accomplish its goals with hardbottom protection in mind. Thus, despite any speculation regarding the meager deduction given NATCO by the consensus group, this court cannot find that the Corps did not properly deduct points from NATCO's proposal for its discussion of hardbottom protection, or treated Bean in an unfair manner as a result of the Corps' evaluation of NATCO's proposal with regard to this issue. Furthermore, although this court might be inclined to reach a different conclusion than the Corps on this matter, absent evidence of the Corps' abuse of discretion, this court will accord the Corps deference with regard to this technical issue and not substitute this court's judgment for that of the agency. *See Analytical & Research Tech., Inc.*, 39 Fed.Cl. at 42; *Cubic Defense Systems, Inc.*, 45 Fed. Cl. at 458.[15]

### 4. Deduction of Points from Bean's Management Approach

■ Bean asserts that the Corps arbitrarily deducted 20 points from its Management Approach plan because Bean's presentation was not given by its project manager. Plaintiff maintains that this deduction was improper because the Corps penalized Bean on the basis of an evaluation criteria not disclosed in the solicitation. Plaintiff's argument is without merit.

Paragraph 4.6 of the solicitation states that the "management plan and past performance portions of the presentation must be present-

---

**15.** As intervenor accurately contends, even if Bean's assertions were supported by the administrative record, plaintiff has not demonstrated that it would have been substantially prejudiced by the Corps' evaluation of NATCO's score given that even with the alleged errors, NATCO's score would have still been scored as superior to Bean's given the numerous faults with Bean's proposal, as discussed, *supra*. *See Alfa Laval Separation, Inc.*, 175 F.3d at 1367 (stating that a protestor must show that had it not been for the alleged error, "there was a substantial chance it would have received the contract award") (citation and internal quotations omitted).

ed by the offeror's project manager." AR 41. This language is not permissive. The mandatory nature of the first sentence is made even more apparent when this sentence is compared to the very next sentence which states that "[f]or major items of subcontracted work (e.g., the breakwater) and for subcontractor past performance, the offeror *may* use the subcontractor's project manager as the presenter." *Id.* (emphasis supplied). When reviewing solicitations, the courts, as when reviewing contractual documents, must look to the "plain language" or "plain meaning" of the solicitation. *Allied Tech. Group, Inc.,* 39 Fed.Cl. at 139. Here, the plain language of the solicitation, most notably the word "must" denotes that the Corps intends this provision to be mandatory. It strains credulity that any reasonable person reading this provision would not understand that this is a requirement and a disclosed evaluation subfactor of the management plan. Furthermore, plaintiff's argument is discredited by its own actions at the presentation. At Bean's oral presentation, Mr. Taylor apologized for its substitution because the project manager was on vacation. Mr. Taylor also stated that he recognized that the substitution was a "breach of the original request." Bean Videotape 2:09:24 to 2:11:16.

Plaintiff seeks to circumvent this clear meaning and requirement by suggesting that the solicitation did not assign points to the person presenting the management plan. Bean also points out to the court that the management plan was presented by the project manager's superior, Mr. Taylor. While it may be true that the solicitation did not expressly assign points to the person presenting the management plan, it is undeniable that the solicitation made it clear that it was mandatory that the presentation be given by the project manager. The GAO has found that an agency decision to deduct points from an offeror's proposal for failure to comply with the requirements in the Instruction to Bidders may be upheld, even if the solicitation does not assign a specific amount of points to that requirement. For example, in *Anthony Hernandez, CPA, P.C.,* B–246104, 92–1 CPD ¶ 146 (Feb. 4, 1992), the GAO sustained the Department of Labor's evaluation panel's decision to downgrade the offeror's proposal when the offeror failed to follow the detailed instructions in the RFP even though the requirement was not allotted a specific point value. The Comptroller General stated that:

> By choosing to ignore the RFP's specific instructions concerning the importance of providing detailed continuing education credits and relevant experience information for each of the key individuals proposed, the protester assumed the risk that, as occurred here, the evaluation panel would not find sufficient details to adequately evaluate each key individual's experience and training as relevant to the required services. . . . Accordingly, we find that the evaluation panel reasonably downgraded the protester's proposal in the personnel qualifications and experience factor.

*Id.* at 3–5. *See also Science & Technology, Inc.,* B–272748, 97–1 CPD ¶ 121 (sustaining agency's deduction of points where the offeror was put on notice of the subfactor since it was in the proposal instructions). In this case, plaintiff was on notice of the subfactor as a requirement because it was in the solicitation and the language made it clear that the offeror must have its project manager present its oral presentation. Therefore, like the offeror in *Anthony Hernandez,* despite plaintiff's protestations, by ignoring the specific instructions in the solicitation, plaintiff put itself at risk that the evaluators would deduct points from its management plan presentation when it did not comply with the instructions in the solicitation.

Finally, this court does not find that the amount of points deducted, twenty, was excessive or arbitrary on the part of the agency. Had the agency not deducted points from plaintiff's presentation for its failure to comply with the instructions, the Corps would have instead been unfair to NATCO, which followed the instructions. Also, given the importance of the project manager to the project, it is not unreasonable that the Corps would require that the project manager give the presentation, particularly when it is the project manager, not the supervisor who would be on-site at the project. The importance the Corps attached to the project man-

ager as key personnel is notable in the record. Section 00100 of the solicitation states that if the offeror's proposal is accepted, "the offeror is prohibited from changing the project manager ... without prior approval ..." AR 37. Moreover, although plaintiff complains that this deduction of twenty points "kept Bean from being included within the next highest competitive range category, and materially prejudiced the competitive range determination", Pl.'s Mot. 24, there is no evidence supporting plaintiff's argument. In fact, it is clear from the above discussion that the majority of Bean's point deductions came from its Technical Approach presentation and that the Corps was more concerned about Bean's failure to assure the Corps that it could perform adequately under the technical requirements than with Bean's management plan. In light of the above, this court cannot find that the TET's decision to reduce Bean's Management Plan presentation by twenty points was unreasonable or arbitrary and capricious.

### 5. Evaluation of Bean's Subcontractor's Past Performance

Plaintiff asserts that the Corps violated FAR provision § 15.306(b)(1)(i) and § 15.306(b)(4) by not discussing Bean's breakwater subcontractor's, [ ], negative past performance record with Bean prior to reducing Bean's subcontractor past performance score by 11 points.

FAR provision § 15.306, in relevant part, states:

(b) Communications with offerors before establishment of the competitive range. Communications are exchanges, between the Government and offerors, after receipt of proposals, leading to establishment of the competitive range. If a competitive range is to be established, these communications—

(1) Shall be limited to the offerors described in paragraphs (b)(1)(i) and (b)(1)(ii) of this section and—

(i) Shall be held with offerors whose past performance information is the determining factor preventing them from being placed within the competitive range. Such communications shall address adverse past performance information to which an offeror has not had a prior opportunity to respond; and

(ii) May only be held with those offerors (other than offerors under paragraph (b)(1)(i) of this section) whose exclusion from or inclusion in, the competitive range is uncertain.

Bean maintains that its subcontractor's past performance was a determining factor preventing Bean's placement into the competitive range. Plaintiff relies on the Corps' statement in the Source Selection Determination memorandum that:

An important indicator which significantly demonstrated the firm's lack of understanding of the care that must be taken to ensure that no damage occur to the environmental resources was their selection of their subcontractor for construction of the breakwater. The subcontractor's past performance documented an unacceptable past performance record in areas of environmental compliance, quality control and responsiveness to customer's needs, which, in effect, would increase the risk of damage to the environmental resources if the contract were awarded to Bean Stuyvesant.

AR 1651. Plaintiff states that "[g]iven the importance of environmental resources in the selection process, it is obvious that the subcontractor's poor past performance had a significant impact on the decision to eliminate Bean." Pl.'s Reply 13.

Although in this memorandum the Corps' language indicates the importance of the environmental factor in its evaluation process and indicates Bean's choice of a subcontractor with such a poor past performance record in an area of environmental compliance is indicative of Bean's lack of understanding in this arena, the Corps' deduction of points for Bean's subcontractor's past performance was not the determining factor preventing Bean from being placed in the competitive range. The import of the Corps' statement was not that the subcontractor's past performance was a determining factor behind Bean's exclusion from the competitive range, but that Bean's choice of a subcontractor with such a

poor past performance record is illustrative of Bean's failure to understand the importance of environmental compliance to this project.

Moreover, plaintiff's conclusion is not supported by the administrative record. A review of the record demonstrates that, despite the Corps' wording in the Source Selection Determination memorandum, Bean's subcontractor lost only [ ] points for its failure to comply with environmental criteria. The subcontractor lost the other [ ] points on the factors of quality control, compliance with safety requirements, responsiveness to customer's needs, timeliness and cost control of change order work. In fact, the only factor that [ ] received a[ ] score for was subcontracting goals, which was worth only [ ]. It is clear that it was not simply [ ] poor environmental compliance record that caused the eleven point deduction. Since Bean's subcontractor's past performance was not the determining factor preventing Bean from being excluded from the competitive range, FAR § 15.306(b)(1)(i) does not apply in this instance.

Finally, plaintiff points to FAR provision § 15.306(b)(4) in support of its argument and contends that under this FAR provision, the agency is required to address past performance information to which an offeror has not previously had an opportunity to comment. Plaintiff's reliance on this provision is misplaced. As noted, § 15.306(b) limits communications to offerors described in paragraphs § 15.306(b)(1)(i) and (ii). It has already been established that § 15.306(b)(1)(i) is not applicable in this case. Likewise, § 15.306(b)(ii) does not apply because there is no indication that the Corps was uncertain about Bean's inclusion or exclusion from the range. This point is highlighted by the fact that Bean's score was so significantly lower than NATCO's, that the Corps never demonstrated any uncertainty about whether to include Bean in the competitive range.

Thus, in light of § 15.306(b)'s language, if plaintiff does not fit into either § 15.306(b)(1)(i) or (ii), then neither would § 15.306(b)(4) apply in the instant case.[16]

### 6. Evaluation of NATCO's Past Performance

Although Plaintiff does not expound upon this point in its motion for summary judgment briefs, in its complaint, plaintiff contends that the Corps did not deduct the highest possible number of points (47) from NATCO's past performance related to its compliance with environmental criteria in prior contracts, in accordance with the evaluation criteria. The administrative record does not support this claim or indicate that the Corps abused its discretion in evaluating NATCO's past performance record.

NATCO submitted three past projects that it believed were similar to the proposed project and additional past projects, in accordance with the solicitation. For its compliance with environmental criteria, NATCO received 20 points out of a possible 22 points for its past performance evaluation from references, and 20 out of a possible 25 points for its past performance presented in NATCO's oral presentation. For NATCO's past performance, the Corps stated with regard to NATCO's past performance projects: (1)[ ], (2)[ ], and (3)[ ], respectively:

1. The environmental resources were basically the same as in this solicitation. NATCO did an outstanding job in complying with the environmental criteria.

2. The environmental resources were basically the same as in this solicitation. NATCO had some problems with complying with the environmental criteria. Some of the problems were related to differing site conditions. NATCO resolved the problems [ ]. NATCO worked well with the various agencies in order to mitigate for

---

16. The legislative history of FAR § 15.306(b) supports this finding. The Civilian Agency Acquisition Council and the Defense Acquisition Regulations Council stated, with regard to adverse past performance information, that:

> We did not revise the rule to permit all offerors to address past performance information to which they have not had a previous opportunity to comment because it would prolong the evaluation process by allowing such exchanges when they will not make a difference in the source selection decision.

62 Fed.Reg. 52112, 51228 (Sept. 30, 1997).

the impacts to the environmental resources. Overall they were satisfactory. 3. The turtle nest monitoring was required on this contract. NATCO complied with all the environmental criteria.

AR. 1343. The individual evaluator comments mirror the above, stating that NATCO had problems in the past with "surfside cable drag"; NATCO had very little weaknesses in the past because they have completed this type of job before; that NATCO had environmental problems in the past but also complied with the environmental criteria; and that differing site conditions affected NATCO's environmental compliance in the past on one project. Furthermore, on the project that NATCO completed that was at the same site as the proposed project, NATCO received an "outstanding" performance evaluation as well as an award for the Corps' Contractor of the Year in the South Atlantic Division.

It is apparent from the above selections from the administrative record that NATCO's overall past performance on similar projects was more than satisfactory, which explains the Corps' low point deduction for NATCO's past performance. Moreover, not only were some of NATCO's problems with environmental compliance in the past corrected in a resourceful manner, but some of them were not due to NATCO's deficiencies, but instead, to differing site conditions. Plaintiff has presented no evidence in the administrative record that contradicts the Corps' findings or indicates that the Corps abused its discretion, acted arbitrarily or capriciously, or violated any statute or regulation. *Miller–Holzwarth, Inc. v. United States*, 42 Fed.Cl. 643, 650–52 (1999), *aff'd*, 2000 WL 291729 (Fed.Cir.2000) (Table) (citation omitted) (finding that plaintiff did not establish that the agency violated the law where the record indicated that, *inter alia*, the expressed concern of one evaluator was outweighed by the other substantial endorsements by the other evaluators, which reflected consideration and assessment of intervenor's overall past performance evaluation). As such, this court finds no reason to second-guess and set aside the Corps' findings, particularly when the administrative record shows a rational relationship between the facts presented and the decision.

## 7. Competitive Range Determination

Finally, Bean contends that the Corps violated procurement law in its competitive range determination. Plaintiff's contention rests upon the following bases: (1) the Corps failed to consider Bean's price in making the competitive range determination, although Bean's proposal was technically acceptable; (2) Bean's proposal was not so technically inferior or out of line as to price to render discussions after establishment of the competitive range unreasonable; (3) in violation of the solicitation, the Corps made non-price factors significantly more important than price factors in making its competitive range determination; (4) the competitive range determination memorandum does not indicate that the CO considered all relevant factors; (5) the CO did not articulate a rational basis for her decision; (6) NATCO's original proposal price exceeded the Government Estimate by more than 25%.

Several of plaintiff's arguments may be quickly addressed, as they are completely without substance. In support of its contention that the Competitive Range Determination memorandum does not demonstrate that the CO considered all relevant factors, plaintiff states that the Competitive Range Determination memorandum did not indicate that the contracting officer reviewed Bean's proposal, the videotape of Bean's presentation, or the evaluators' rationale for awarding Bean its low point score. Pursuant to paragraph 4.7 of the solicitation, the contracting officer was present at Bean's oral presentation. Consequently, at this time, she was aware of Bean's proposal since she was present and there was no need for her to review a videotape of an event that she attended. Furthermore, although the Competitive Range Determination memorandum was short, it did not simply mimic the rating system's language for an offeror whose score is 685 points, like Bean's. The memorandum also states Bean "failed to adequately address the solicitation requirements and a significant revision of the proposal would be required; in which case, the government

would be put in the position of leading the offeror to a solution or approach, which is unfair to the other offeror." AR 1637. This language indicates that the CO must have looked at requisite documents to make this determination and it adequately articulates the CO's rationale, although it might be brief. Furthermore, Bean has offered no evidence in support of its claim.

Plaintiff's argument that NATCO's original price was more than 25% over the Government Estimate is likewise without merit. Pl.'s Mot. 14. As previously stated, paragraph 5 of Section 00100, "Proposal Evaluation Procedures", sets forth the requirement that offers are not to exceed 25%. The solicitation also states that the Government will evaluate all offers for award on the total price for the basic requirement *and* all options. AR 49. It is undisputed that NATCO's original proposed price for the basic requirement and all options was [ ]% above the Government estimate. Therefore, Bean's contention that NATCO's proposed price for the base contract exceeded the Government estimate by more than 25% is irrelevant to the case at hand.

### a. Consideration of Price

■■■■■ Plaintiff contends that the contracting officer did not consider Bean's lower proposal price before making the competitive range determination, despite Bean's proposal being in the technically acceptable score range. It is well-established that price must always be a factor in an agency's decision to award a contract. 10 U.S.C. § 2305(a)(3)(A); 41 U.S.C. § 253a(c)(1)(B); FAR § 15.304(c)(1). Moreover, an agency may not discount the importance of price in a price/technical tradeoff to such an extent that it "effectively renders the price factor meaningless." *Lockheed Missiles & Space Co., Inc. v. Bentsen*, 4 F.3d 955, 958 (Fed.Cir. 1993) (citing *Grumman Data Sys. Corp.*, GSBCA No. 11635–P, 92–1 BCA CCH ¶ 24,-700 at 123, 721). These requirements "mean that an agency may not exclude a technically acceptable proposal from the competitive range without taking into account the relative cost of that proposal to the government." *Meridian Management Corp.*, 2000 WL

1097129, *3 (July 19, 2000) (citing *Kathpal Techs., Inc.; Computer & Hi–Tech Management, Inc.*, B–283137.3 (Dec. 30, 1999) 2000 CPD ¶ 6 at 9).

■■■■ Plaintiff's primary support for its argument is that the Competitive Range Determination memorandum only "recites" the offerors' prices before stating the reasons Bean was eliminated from the competitive range. Plaintiff maintains that this "recitation" does not constitute a "consideration" of price. In defense, defendant challenges plaintiff's claim, stating that the language in the memorandum that states "based on the above, a total score [sic] 685 points eliminates Bean Stuyvesant from the competitive range . . .", is indicative that the CO considered price, as set forth in the first paragraph in the memorandum, in making her competitive range determination. Def.'s Opp. 3. Both defendant and intervenor also maintain that the CO's Source Selection Determination memorandum, dated three business days after the Competitive Range Determination memorandum, demonstrates that the CO considered Bean's lower price in making her determination.

Bean objects to the court reviewing the Source Selection Determination memorandum to determine the issue, suggesting that the Source Selection Determination memorandum is not appropriate for review by the court and that the Corps did not rely on this document in making its competitive range determination. At oral argument, both defendant and intervenor challenged plaintiff's claim. Intervenor relied upon the APA, 5 USC § 706, which states that in reviewing an agency action, the court shall review the entire record before the agency. Intervenor maintains that the whole record in this case includes the Source Selection Determination memorandum. Intervenor stated:

The fact that the source selection determination was prepared three business days after the competitive range determination should not make a difference . . . . this is not a document created after a protest was filed, after litigation was instituted, in the best [sic] of the adversarial process. This is a document that is required to be in the contract file. It is normally created in the

ordinary course of the procurement and which sets forth the history of the procurement and the reasoning behind the contracting officers [sic] and the source selection authorities [sic] decisions in the procurement.

Tr. 75:2–12.

This court agrees with the intervenor. Although the Source Selection Determination memorandum was not prepared before or even on the same day as the Competitive Range Determination memorandum, this court may consider the Source Selection Determination memorandum in determining whether the Corps considered price in making its decision. This document was not made in response to plaintiff's protest and there is no evidence, based on the discussions above regarding plaintiff's poor scores for its Technical Approach, that the Corps used or needed this document for a "post-hoc rationalization", as plaintiff claims. Moreover, the Source Selection Determination memorandum is a credible document since the rationale contained therein is consistent with the administrative record and merely sets forth, in more detail, the reasoning behind the Corps' decision. *See ITT Federal Servs. Int'l Corp.*, B–283307, 283307.2, 99–2 CPD ¶ 76 at 5–7 (Nov. 3, 1999) (finding that since the negotiation memorandum was prepared the day after the Selection Statement, contained a contemporaneous recitation of the Army's understanding of the reasons why the protestor lowered its costs, reflected the same concerns as the Selection Statement and was not prepared "in the heat of the adversarial process", the GAO did not have to limit its review to the Selection Statement).[17] As such, this court, in accordance with the APA standard, will review the Source Selection Determination in conjunction with the Competitive Range Determination memorandum to determine whether the CO considered price in her decision.

In addition to the Competitive Range Determination memorandum, the Source Selection Determination memorandum's language makes it clear that the contracting officer considered price before making the competitive range determination. The Source Selection Determination memorandum states, under the paragraph designated "Competitive Range Determination":

> Even though the price submitted by Bean Stuyvesant was less than the Government Estimate, $[ ] less than NATCO's original proposed price and $[ ] less than NATCO's revised price, the lack of demonstrated technical experience in their proposal and their failure to indicate any understanding of the significance of protection of the environmental resources would make award to the firm unacceptable regardless of their price.

AR 1650–51. Despite plaintiff's protestations, this paragraph demonstrates that the Corps compared both offeror's prices and that although Bean's price was lower than NATCO's the Corps determined that based on Bean's non-price evaluation, it could not place Bean in the competitive range.

### b. Establishment of the Competitive Range

An agency is granted wide discretion in establishing a competitive range and a court may not set aside an agency's determination unless it is clearly unreasonable. *W & D Ships Deck Works, Inc.*, 39 Fed.Cl. at 643 (citing *Birch & Davis*, 4 F.3d at 973). However, when the government official establishes a competitive range of one offeror, the decision is subject to close scrutiny. *Impresa Construzioni Geom. Domenico Garufi*, 44 Fed.Cl. at 553 (citations omitted). With regard to the competitive range, FAR § 15.306(c) states that "[b]ased on the ratings of each proposal against all evaluation criteria, the contracting officer shall establish a competitive range comprised of all of the most highly rated proposals ...." This provision of the FAR replaced the previous provision governing the establishment of the competitive range, FAR § 15.609(a), that in-

---

**17.** Intervenor also raised another instructive point at oral argument. Counsel argued that if this court can consider affidavits prepared after litigation that give further explanation of existing rationale, it should also be able to consider a document already in the administrative record to explain the agency's decision. Counsel's point is well taken and the court finds this argument persuasive as well.

structed the contracting officer to include only those proposals that had "a reasonable chance of being selected." *See* 62 Fed.Reg. 51224 (1997).

Even at first glance, it is readily apparent that since Bean's proposal was not one of the most highly rated proposals and since the court agreed that the Corps articulated a rational basis for this decision, under FAR § 15.306(c), the contracting officer properly excluded Bean's proposal from the competitive range. However, plaintiff maintains that unless it's proposal was so technically inferior as to render discussions meaningless, it should have been included in the competitive range. Bean's argument rests upon the fact that although its overall score was significantly less than NATCO's, under the overall numerical rating system, its proposal was technically acceptable, AR 1666, and the solicitation stated that "non-price factors are slightly more important than price" in making a source selection determination, AR 41. *Id.* 11–12.

Plaintiff overlooks the fact that although it received 685 points under the overall numerical rating system, its Technical Approach was found severely lacking. Plaintiff received 280 points out of 500 points. A total of 180 points were deducted for its methods of performing the tasks with environmental concerns in mind. The majority of the other points received were based upon the fact that plaintiff's *equipment* was capable of accomplishing these tasks in seas three feet and above. Upon a review of Bean's Technical Approach, it is apparent that although Bean's overall rating was "marginally" acceptable, its proposal was highly inferior with respect to its Technical Approach; particularly so on factors and subfactors that the Corps gave Bean notice were of paramount importance. The administrative record supports this point, most notably the Best Value Technical Assessment document and the Source Selection Determination memorandum.

Furthermore, although the solicitation states that "non-price factors are slightly more important than price", Bean's proposal is so technically deficient that even if the Corps had included Bean's proposal in the range, it would have needed to have discus-

sions with Bean, not simply on minor point(s), but on a critical issue that affected nearly every factor of Bean's Technical Approach. These discussions would have led to major revisions of Bean's proposal and the Corps would have had to essentially "lead" Bean to the proper Technical Approach. This point is underscored by the language in the solicitation under the section entitled "Technical Approach" that states that the objective of the offeror's proposal "should be to instill confidence that the offeror thoroughly understands the requirements and complexities of this project". AR 39. As stated in the administrative record and as demonstrated by this court, Bean's proposal failed to "instill confidence" and further discussions would not necessarily have been meaningless but would have been held to give Bean the opportunity, that it already had before, to instill confidence that it understood the project. Such a scenario is exactly what was trying to be avoided when FAR Part 15 was rewritten. The legislative history states:

> We considered retaining the existing FAR standard for inclusion in the competitive range, but ultimately rejected it because there are readily discernible benefits from including only the most highly rated offers in the competitive range. First, those included will know that they have a good chance of winning the competition—making it in their best interests to compete aggressively. Second, those eliminated from the range are spared the cost of pursuing an award they have little or no chance of winning. *Retaining marginal offers in the range imposes additional, and largely futile, effort and cost on both the Government and industry.*

62 Fed.Reg. 51224, 51226 (1997) (emphasis added). It is also important to note that the Corps intended to award the contract "without discussions". If no discussions were to be held, even if Bean was included in the competitive range, with its extremely low score, Bean did not have a substantial chance of winning the proposal.

Furthermore, there is evidence in the administrative record that the contracting officer did a comparative assessment of the pro-

posals against the evaluation criteria in the solicitation, and on that basis, determined that Bean's proposal was not to be included in the competitive range. This court and the GAO have upheld an award where non-price factors are equal to price and the awardee's proposal is superior on non-price factors, but has a slightly higher price. *Marine Hydraulics,* 43 Fed.Cl. at 674–75; *Calspan Corp.,* B–258441, 95–1 CPD ¶ 28 at 11–14 (Jan. 19, 1995). The Comptroller General, in *Calspan Corp.,* articulated the rationale for such a decision, noting that while a selection decision may focus on the greater technical strength, it does not mean that the decision was inconsistent with the solicitation's evaluation scheme when the selection authority considers the combined factors and whether the advantages of the combined other factors outweighs one factor, such as cost. In that case, it is not that the selection official changed the relative weights of the evaluation factors, it is that one factor has "become the discriminator between competing proposals." *Calspan Corp.,* B–258441, 95–1 CPD ¶ 28 at 12. Such is the case here. Although, in the instant case, the court is presented with a challenge to the competitive range determination rather than to the award decision, the cited caselaw remains applicable. Additionally, in the present case, such application is even more favorable to the Government since the evaluation scheme here is one in which non-price factors are slightly *more* important than price, rather than of equal importance, as in the previously cited cases. Here, the contracting officer did not change the relative weights of the non-price and price factors, she simply evaluated the proposals and found that Bean's cost advantage was drastically outweighed by Bean's performance on the other significant factors in the solicitation. Her decision is well-supported by the administrative record, is rational, and consistent with the evaluation criteria in the solicitation.

In light of the above, although this court agrees with plaintiff that a competitive range determination of one should be given "strict scrutiny" and that federal acquisition policy generally favors inclusion of bidders with a reasonable chance of selection "within the competitive range in the early stages of pro-curement," *Cubic Defense Systems, Inc.,* 45 Fed.Cl. at 460–61 (citations omitted), given the overwhelmingly apparent technical inferiority of Bean's proposal, this court finds that the Corps' determination to exclude Bean from the competitive range, as an offeror whose proposal was not highly rated, was not irrational, arbitrary and capricious or otherwise in violation of the law.

## 8. Injunctive and Declaratory Relief

Absent a finding that the Corps' actions were arbitrary, capricious, an abuse of discretion, or in violation of applicable statutes and regulations, this court need not consider Bean's motion for injunctive and declaratory relief.

## III. CONCLUSION

For the above-stated reasons, it is **ORDERED** that:

(1) Plaintiff's Motion for Summary Judgment on the Administrative Record, including all of its requests for injunctive and declaratory relief, is **DENIED.** Defendant's and Intervenor's Cross–Motions for Summary Judgment on the Administrative Record are **GRANTED;**

(2) The Clerk is directed to enter final judgment dismissing the complaint in this action;

(3) On or before **December 1, 2000,** counsel for each party shall file with the Clerk's Office a redacted copy of this Opinion, with any material deemed proprietary marked out in brackets, so that a copy of the Opinion can then be prepared and made available in the public record of this matter; and

(4) Each party must bear its own costs.